**BELLSOUTH TELECOMMUNICATIONS, INC. Plaintiff**

v.

**MISSISSIPPI PUBLIC SERVICE COMMISSION, Dorlos "BO" Robinson, in His Official Capacity as the Chairman of the PSC, Nielson Cochran, in His Official Capacity as the Vice Chairman of the PSC, and Michael Callahan, in His Official Capacity as Commissioner of the PSC Defendants**

Nuvox Communications, Inc., KMC Telecom III, LLC, and KMC Telecom V, Inc., Xspedius Communications LLC on Behalf of Its Operating Subsidiaries Xspedius Management Co. Switched Services, LLC and Xpedius Management Co. of Jackson, and Communigroup of Jackson, Inc. D/B/A Communigroup and McImetro Access Transmission Services LLC Defendant–Intervenors

No. CIV.A. 3:05CV173LN.

United States District Court,
S.D. Mississippi,
Jackson Division.

April 13, 2005.

John C. Henegan, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Sean A. Lev—PHV, Kellogg, Huger, Hansen, Todd, Evans & Figiel, PLLC, Washington, DC, Thomas B. Alexander, BellSouth Telecommunications, Inc., Jackson, for Plaintiff.

George M. Fleming, Mississippi Public Service Commission, Steven J. Allen, Brunini, Grantham, Grower & Hewes, Kathryn H. Hester, Watkins Ludlam Winter & Stennis, P.A., Robert P. Wise, Wise, Carter, Child & Caraway, Jackson, James U. Troup—PHV, McGuirewoods, LLP—Washington, Washington, DC, for Defendants.

### MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of plaintiff BellSouth Telecommuni-

cations (BellSouth) for preliminary injunction asking that the court enjoin the March 9, 2005 order entered by the Mississippi Public Service Commission to the extent that such order allows competitors to place new UNE–Platform orders. Defendant Mississippi Public Service Commission (PSC) and the various intervenors filed responses in opposition to the motion. Based on its review of the parties' submissions and their arguments to the court at the April 8th hearing on the motion, the court concludes that BellSouth's motion should be granted.

On February 4, 2005, the Federal Communications Commission (FCC) released its Triennial Order on Remand (TRRO) in CC Docket No. 01–338 following remand in *United States Telecom Association v. Federal Communications Commission,* 359 F.3d 554 (D.C.Cir.2004).[1] In the TRRO, among other things, the FCC established new unbundling rules regarding mass market local circuit switching, high-capacity loops and dedicated interoffice transport. All that is relevant to the present motion is its ruling as to mass market switching.[2] Prior to the TRRO, the FCC, pursuant to its authority under the Telecommunications Act of 1996, had consistently held that incumbent local exchange carriers (incumbent LECS), such as BellSouth, were required to provide access to the individual parts of their network systems—switches, loops and transport—on an unbundled basis and at prescribed prices, in order that

the competitive LECS would be in a position to effectively compete in the marketplace. These individual parts of the system are known as "unbundled network elements" or UNEs, and as BellSouth explains, access to unbundled switching is important because it makes it possible for competitive LECs to obtain the UNE Platform (or UNE–P), which consists of all the individual or piece-parts of the BellSouth network combined.

In its TRRO, the FCC ruled that the ability of competitive LECs to compete would not be impaired without access to unbundled switching, and concluded, therefore, that incumbent LECs would no longer be required to provide competitive LECs with access to unbundled switching. It specifically recognized that immediate implementation of its new rules posed a potential for disruption in service, and therefore established a twelve-month transition period, with accompanying transition pricing, for migration of competitive LECs' "embedded customer base" from UNE–P to alternate arrangements for service. The FCC determined that this twelve-month transition period would provide "adequate time for both competitive LECs and incumbent LECs to perform the tasks necessary to an orderly transition," and hence gave carriers twelve months from the date of the TRRO to "modify their interconnection agreements, including completing any change of law processes," to implement the changes directed by the TRRO.[3] The FCC stated in

1. *See* Order on Remand, *IN RE UNBUNDLED ACCESS TO NETWORK ELEMENTS,* WC Docket No. 04–313, CC Docket, No. 01–338, 2005 WL 289015 (F.C.C. Feb. 4, 2005).

2. BellSouth's complaint in this cause also seeks relief based on provisions of the TRRO concerning the unbundling of loops and transport, but the present motion concerns only the FCC's ruling pertaining to access to switching.

3. As dictated by the Telecommunications Act of 1996, 47 U.S.C. §§ 251 and 252, incum-

bent LECs and competitive LECs operate pursuant to "interconnection agreements" which must conform the legal requirements established by the FCC and which are approved, interpreted and enforced by state public utilities commissions. These interconnection agreements typically specify a change of law process by which the parties are required to engage in notice, negotiation and, if necessary, dispute resolution, to account for changes in the law that apparently occur with relative frequency in this area.

the TRRO, however, that the transition period it adopted applied "only to the embedded customer base, and does not permit competitive LECs to add new UNE–P arrangements using unbundled access to local circuit switching pursuant to section 251(c)(3). . . ."

Accordingly, on February 11, 2005, BellSouth sent out a "Carrier Notification" to all of its competitive LECs advising that as of March 11, 2005, the effective date of the TRRO, BellSouth would no longer accept orders for switching as a UNE item. A number of the competitive LECs responded by filing a Joint Petition for Emergency Relief with the PSC, asking that BellSouth be directed to continue to provide unbundled switching in accordance with its undertaking in its interconnection agreements until such time as the parties had completed the change of law process. In response, the PSC entered the order that is the subject of BellSouth's present motion, ruling that the parties were required to adhere to the change of law process in their interconnection agreements and that until such time as the process, including arbitration, was completed, BellSouth would be required to continue accepting and provision competitive LECs' orders as provided for in their interconnection agreements.

BellSouth brought this action seeking declaratory relief and a preliminary injunction pending the court's expedited review of the PSC's order. BellSouth takes the position that the PSC's order is contrary to, and preempted by the FCC's TRRO, and it thus seeks an order enjoining all defendants from seeking to enforce the PSC's order.[4]

■ To prevail on its request for injunctive relief, the burden is on BellSouth to show "(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that irreparable injury will result if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985) (citing *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567 (5th Cir.1974)).

The question of BellSouth's likelihood of success on the merits raises two issues: First, while the FCC's February 4, 2005 Order on Remand unequivocally provides for a "nationwide bar on [unbundled switching]," did the FCC intend that this aspect of its Order would be self-effectuating, and if so, was it within the FCC's jurisdiction to make the bar self-effectuating.

■ As to the first issue, a comprehensive review of all potentially relevant provisions of the TRRO demonstrates convincingly that the FCC envisioned that the bar on new-UNE-P switching orders would be immediately effective on the date

4. Reacting to BellSouth's motion, several of the competitive LECs moved to intervene and orders have been entered granting these motions. One purpose for which one of the intervenors, CommuniGroup of Jackson d/b/a Communigroup, sought to intervene was to file a motion to compel arbitration contending that this dispute is subject to arbitration under its interconnection agreement with BellSouth. Although there has been a significant amount of briefing on this arbitration issue by the parties, the court finds it unnecessary to dwell on this motion for it is manifest that CommuniGroup's position with respect to arbitration is misplaced. BellSouth claims, quite simply, that the PSC's order requiring it to continue to process new orders for UNE–P switching violates federal law and should be enjoined. There is no sense in which this dispute falls within the "arbitration" provision of any interconnection agreement. Accordingly, the motion to compel arbitration will be denied.

established in the order, March 11, 2005, without regard to the existence of change of law provisions in parties' Interconnection Agreements. The TRRO makes clear in unequivocal terms that the transition period applies only to the embedded customer base, and "does not permit competitive LECs to add new customers using unbundled access to local circuit switching." [5] At ¶ 227, the Order recites,

> We require competitive LECs to submit the necessary orders to convert their mass market customers to alternative service arrangement within twelve months of the effective date of this Order. *This transition period shall apply only to the embedded customer base, and does not permit competitive LECs to add new UNE–P arrangements using unbundled access to local switching pursuant to section 251(c)(3) except as otherwise specified in this order.* . . . We believe that the twelve-month period provides adequate time for both competitive LECs and incumbent LECs to per-

form the tasks necessary to an orderly transition, which could include deploying competitive infrastructure, negotiating alternative access arrangements, and performing loop cut overs or other conversions. Consequently, carriers have twelve months from the effective date of this Order to modify their interconnection agreements, including completing any change of law processes. By the end of the twelve month period, requesting carriers must transition the affected mass market local circuit switching UNEs to alternative facilities or arrangements. (Emphasis added).

Given the clarity with which the FCC stated its position on this issue, it is not surprising that the majority of state utilities commissions and courts, by far, having considered this issue have held, on persuasive reasoning, that the FCC's intent in the TRRO is an unqualified elimination of new UNE–P orders as of March 11, 2005, irrespective of change of law provisions in parties' interconnection agreements.[6]

---

**5.** *See* TRRO ¶ 199; *see also* ¶ 5 ("This transition plan applies only to the embedded customer base, *and does not permit competitive LECs to add new switching UNEs.*") (emphasis added); ¶ 127 (quoted in text).

**6.** *See BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC*, No. 1:05CV0674CC, 2005 WL 807062 (N.D.Ga. April 5, 2005) (granting BellSouth's emergency motion for preliminary injunction against order of Georgia PSC to the extent the order required BellSouth to continue to process new orders for switching as an unbundled network element); Ind. Util. Reg. Comm'n, *Order on Complaint of Indiana Bell Tele. Co., Inc. d/b/a SBC Ind. For Expedited Review of a Dispute with Certain CLECs Regarding Adoptino of an Amendment to Commission Approved Interconnection Agreements*, Cause No. 4278, at 7, (March 9, 2005) ("We find the more reasonable interpretation of the language of the TRRO is the intent to not allow the addition of new UNE–P customers after March 10, 2005," irrespective of change of law processes provided by parties' interconnection agreements); · Pub. Utilities

Comm'n of Ohio, *Order on Emergency Petition for Declaratory Ruling Prohibiting SBC Ohio from Breaching its Existing Interconnection Agreements and Preserving Status Quo With Respect to Unbundled Network Element Orders*, Case No. 05–298–TP–UNC (March 9, 2005) (concluding that while SBC Ohio was required to negotiate and executed interconnection agreements as to embedded customer base, "[t]he FCC very clearly determined that, effective March 11, 2005, the ILECs unbundling obligations with regard to mass market local circuit switching . . . would no longer apply to serve new customers"); New York Pub. Serv. Comm'n, *Order Implementing TRRO Changes*, Case No. 05–C–0203 (March 16, 2005) ("Based on our careful review of the TRRO, we conclude that the FCC does not intend that new UNE–P customers can be added during the transition period. . . ."); Pub. Util. Comm'n of Ca., *Assigned Commissioner's Ruling Granting in Part Motion for Emergency Order Granting Status Quo for UNE–P Orders*, Application 04–03–014 (March 10, 2005) (concluding that pursuant to the TRRO, "Verizon has no obligatin to process

Despite this, the PSC and defendant intervenors, relying primarily on § 233 of the TRRO, included in a section entitled "Implementation of Unbundling Determination," argue that the FCC's ruling as to new orders for unbundled switching is not self-effectuating but rather is subject to the negotiation process dictated by the parties' interconnection agreements. Paragraph 233 states:

> We expect that incumbent LECs and competing carriers will implement the Commission's findings as directed by section 252 of the Act. Thus, carriers must implement changes to their interconnection agreements consistent with our conclusions in this Order.... Thus, the incumbent LEC and competitive LEC must negotiate in good faith regarding any rates, terms, and conditions

CLEC orders for UNE–P to serve new customers"); Pub. Util. Comm'n of Tex., *Proposed Order on Clarification*, Dkt. No. 28821 (March 8, 2005); New Jersey Bureau Pub. Util., Open Hearing, *Implementation of the FCC's Triennial Review Order*, Dkt. No. TO03090705 (March 11, 2005) (refusing to require Verizon to continue providing unbundled access to New discontinued UNE orders as of March 11th); Rhode Island Pub. Util. Comm;n, Open Meeting, *Adopting Verizon's Proposed RI Tariff Filing*, Dkt. 3662 (March 8, 2005) (adopting tariff filing of Verizon which provide that Verizon would no longer accept orders for the subject elements (i.e., switching) as of March 11, 2005); State Corp. Commission of Kansas, *Order Granting in Part and Denying in Part Formal Complaint and Motion for Expedited Order*, Dkt. No. 04–SWBT–763–GIT (March 10, 2005) (agreeing with incumbent LEC regarding the self-effectuating nature of the TRRO as to serving new customers, and observing that "[i]t does not make sense to delay implementation of these provisions by permitting an interconnection scheme contrary to the FCC's rulings to persist"); Mass. Dept. Of Telecommunications and Energy, *Open Meeting on Complaint Against Verizon for Emergency Declaratory Relief Related to the Continued Provision of Unbundled Network Elements After the Effective*

necessary to implement our rule changes.

In its March 16, 2005 *Order Implementing TRRO Changes*, the New York Public Service Commission considered and rejected an argument that ¶ 233 of the Order requires incumbent LECs to follow change of law provisions in interconnection agreements with respect to implementation of the bar on new orders for UNE–P switching, stating:

> Although TRRO ¶ 233 refers to interconnection agreements as the vehicle for implementing the TRRO, had the FCC intended to use this process for new customers, we believe it would have done so more clearly. Paragraph 233 must be read together with the FCC directives that UNE–P obligations for new customers are eliminated as of March 11, 2005. Providing a true-up for

*Date of the Order on Remand*, Dkt. No. 334–05 (March 22, 2005) (denying request for order requiring Verizon to continue to accept and process orders for unbundled network elements pursuant to their interconnection agreements and to require Verizon to comply with change of law provision); Mich. Pub. Serv. Comm'n, *Order on Application of the Competitive 12 Local Exchange Carriers*, Case No. U–14303, at 9 (March 29, 2005) (concluding that competitors "no longer have a right under Section 251(c)(3) to order [the UNE Platform] and other UNEs that have been removed from the [FCC's] list"); Me. Pub. Util. Comm'n, *Order on Verizon–Maine Proposed Schedules, Terms, Conditions and Rates for Unbundled Network Elements and Interconnection and Resold Servs.*, Dkt. No.2002–682, at 4 (March 7, 2005) ("We find that the FCC intended that its new rules de-listing certain UNEs be implemented immediately rather than be the subject of interconnection agreement amendment negotiations before becoming effective.").

Contrary holdings have been issued only by the Kentucky and Louisiana Public Utilities Commissions, and the United States District Court for the Northern District of Illinois, *Illinois Bell Telephone Co. v. Hurley*, 2005 WL 735968, *6 (N.D.Ill.2005).

new UNE–P customers would run contrary to the express directive in TRRO § 227 that no new UNE–P customers be added.

The court in *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC,* No. 1:05CV0674CC, 2005 WL 807062 (N.D.Ga. April 5, 2005), found the New York Commission's reasoning persuasive:

> The PSC's reading of the FCC's order would render paragraph 233 inconsistent with the rest of the FCC's decision. Instead of not being permitted to obtain new facilities, as the FCC indicated should be the rule, *see, e.g., Order on Remand* ¶ 199, competitive LECs would be permitted to do so for as long as the change of law process lasts. Moreover, it is significant that the FCC expressly referred to the possible need to modify agreements to deal with the transition as to the embedded base, *see id.* ¶ 227, but did not mention a need to do so to effectuate its "no new orders" rule, *see id.* In sum, the Court believes there is a significant likelihood that it will agree with the conclusion of the New York Public Service Commission that paragraph 233 "must be read together with the FCC directives that UNE–P obligations for new customers are eliminated as of March 11, 2005.." *New York Order* at 13, 26. Any result other than precluding new UNE Platform customers on March 11, would "run contrary to the express directive . . . that no [UNE Platform] customers be added" and thus result in a self-contradictory order. *Id.*

The court similarly finds this reasoning persuasive.[7] Moreover, the notion that

BellSouth should be made to negotiate over something which the FCC has determined it has no obligation to offer on an unbundled basis and which BellSouth has no intention of offering simply makes no sense. As was cogently observed by the Rhode Island Public Utilities Commission,

> As a practical matter, it is not obvious to us what issues would remain to be negotiated concerning the section 251 UNEs de-listed by the FCC; the FCC has been clear that these UNEs are no longer required to be unbundled under section 251. The end result after going through the step of amending the interconnection agreements will be the same as enforcing the March 11th deadline immediately, albeit with some delay.

*Adopting Verizon's Proposed RI Tariff Filing,* Dkt. 3662 (R.I.PUC March 8, 2005).

The PSC and defendant intervenors next argue that even if the court were to conclude that the TRRO was intended to be self-effectuating, it still may not be given effect inasmuch as the FCC lacks jurisdiction to abrogate the terms and conditions of existing interconnection agreements regarding unbundled switching. In this vein, they argue that the parties' respective rights and obligations vis-a-vis BellSouth's provision of unbundled switching are governed exclusively by the parties' voluntarily negotiated interconnection agreements, over which the FCC has no jurisdiction. They further submit that even if the FCC did have jurisdiction to modify or abrogate the interconnection agreements, the TRRO does not reflect

---

7. It does so, as well, recognizing that there is authority to the contrary. *See Illinois Bell Telephone Co. v. Hurley,* 2005 WL 735968, \*6 (N.D.Ill.2005) ("Unlike ¶ 227, ¶ 233 of the TRO Remand Order does not address only existing customers. Rather, it falls under the general heading of 'Implementation of Unbundling Decisions' and mandates that the parties 'negotiate in good faith regarding *any* rates, terms, and conditions necessary to implement' the rule changes. This requirement presumably would include the substantially increased rate SBC now wishes to charge the CLECs seeking access to SBC's switches."),

that the FCC made the requisite findings under the *Mobile Sierra* doctrine.

These arguments raise the question, highlighted by the parties' arguments, of whether the TRRO was intended to directly abrogate or modify the interconnection agreements, or whether, instead, enforcement of the TRRO would indirectly result in the modification of or abrogation of portions of the interconnection agreements. In either case, however, and despite the defendant and defendant-intervenors' protestations to the contrary, the FCC had authority to act in the manner it did.[8]

■ If the FCC's Order is viewed not merely as a general regulation which bears on the proper interpretation of the interconnection agreements but as an outright abrogation of provisions of parties' interconnection agreements, consideration of its jurisdiction to act in the premises must take into account that interconnection agreements are "not ... ordinary private contract[s]," and are "not to be construed as ... traditional contract[s] but as ... instrument[s] arising within the context of ongoing federal and state regulation." *E.SPIRE Communications, Inc., v. N.M. Pub. Regulation Comm'n,* 392 F.3d 1204, 1207 (10th Cir.2004); *see also Verizon Md., Inc. v. Global Naps, Inc.,* 377 F.3d 355, 364 (4th Cir.2004) (interconnection agreements are a "creation of federal law" and are "the vehicles chosen by Congress to implement the duties imposed in § 251"). It cannot reasonably be disputed that the provisions in the various interconnection agreements permitting the UNE Platform are there not because this was

something the parties freely and voluntarily negotiated, but rather because this is what BellSouth was required to provide by law, and specifically by the FCC's earlier unbundling decisions. As BellSouth aptly notes, these provisions are vestiges of the now-repudiated FCC regime. *See Bell-South v. MCIMetro Access,* No. 1:05CV0674CC (N.D.Ga. April 5, 2005) ("[I]t would be particularly appropriate for the FCC to take that action because it was undoing the effects of the agency's own prior decisions, which have been repeatedly vacated by the federal courts as providing overly broad access to UNEs, ... and [i]n any event, any challenge to the FCC's authority to bar new UNE–Platform orders must be pursued on direct review of the FCC's order, not before this Court."); *see also AT&T Communications of Southern States, Inc. v. Bellsouth Telecommunications Inc.,* 229 F.3d 457, 465 (4th Cir. 2000) (observing that "many so-called 'negotiated' provisions (in interconnection agreements) represent nothing more than an attempt to comply with the requirements of the 1996 Act."); *see also Bell-South Telecomms.,* 317 F.3d at 1298 (Anderson, J., concurring) (interconnection agreements are "mandated by federal statute" and even voluntary agreements are "cabined by the obvious recognition that the parties to the agreement had to agree within the parameters fixed by the federal standards"). Thus, it is substantively inaccurate to characterize the FCC's action as an abrogation of private contracts, and more accurate to characterize it as the elimination of the legal requirements that had dictated the substance of the parties'

---

8. In the numerous rulings by state utilities commissions and courts addressing the FCC's Order, none to date has directly addressed whether the FCC had jurisdiction to impose its immediate bar to new orders for unbundled switching. Perhaps that is because no party has challenged the FCC's jurisdiction in this regard. Indeed, the recent opinion by the Georgia District Court specifically noted that "the [Georgia] PSC does not dispute that the FCC has the authority to make its order immediately effective regardless of the contents of particular interconnection agreements." *BellSouth v. MCIMetro Access,* 2005 WL 807062, at *2.

regulatory agreements.[9] And while the 1996 Telecommunications Act vested direct jurisdiction over interconnection agreements with the state utilities commissions, it did not divest the FCC of all authority with respect to such agreements. On the contrary, the Supreme Court has clearly held that the FCC has authority to issue rules and orders implementing all aspects of the 1996 Telecommunications Act. *See Iowa Utilities Board,* 525 U.S. at 380, 119 S.Ct. 721 (the Act "explicitly gives the FCC jurisdiction to make rules governing matters to which the 1996 Act applies"). And thus, "[w]hile it is true that the 1996 Act entrusts state commissions with the job of approving interconnection agreements... these assignments ... do not logically preclude the Commission's issuance of rules to guide the state-commission judgments," *id.* at 385, 119 S.Ct. 721. To the extent a state commission's judgment concerning the interpretation of an approved agreement conflicts with the FCC's interpretation of the FCC regulations, the FCC's interpretation controls under the Supremacy Clause. *MCI Telecommunication Corp. v. Bell Atl.–Pa.,* 271 F.3d 491, 516 (3d Cir.2001) (stating that "[i]f the PUC's interpretation conflicts with that of the FCC, the PUC's determination must be struck down"). Here, this court perceives that the FCC has determined as a matter of policy that the Telecommunications Act does not require the provision of unbundled switching and that the bar on new UNE switching orders is to be immediately effective without regard to change of law provisions in specific interconnection agreements. From its conclusion in this regard, in keeping with its plenary authority under the 1996 Act, it follows that the FCC's conclusion prevails over the PSC's contrary conclusion.

Certain of the intervenors, namely Communigroup and MCI, argue that BellSouth "still has to provide [UNE–Platform] under Section 271, regardless of the elimination of [the UNE–Platform] under Section 251." [10] The New York Public Utilities Commission considered a similar argument by competitive LECs that even if the incumbent LEC no longer was obliged to provide access to UNE–P under the TRRO determination, it still had an obligation to continue providing such access pursuant to 47 U.S.C. § 271. The Commission rejected the argument, noting that in light of the FCC's decision "to not require BOCs to combine section 271 elements no longer required to be unbundled under section 251, it [was] clear that there is no federal right to 271–based UNE–P arrangements." This court would tend to agree. It would further observe, though,

**9.** The *Mobile–Sierra* doctrine, invoked by defendant and defendant intervenors, holds that the FCC may abrogate or modify freely negotiated private contracts only if required by the public interest, and requires that the agency make a particularized finding that the public interest requires a modification to or an abrogation of an existing contract. The court is not persuaded that the *Mobile Sierra* doctrine in this context is relevant, particularly given the court's conclusion that the interconnection agreements are not ordinary private contracts that were freely negotiated between the parties. However, even if the doctrine applied, the FCC's order reflects the Agency's finding that the bar on new UNE–P switching orders should take effect immediately since the continued use of the UNE–Platform "hinder[ed] ... genuine facilities based competition and was thus contrary to public policy. *See* TRRO ¶ 218, 236."

**10.** Section 271 of the Telecommunications Act appears in a section entitled "Special Provisions Concerning Bell Operating Companies," 47 U.S.C. §§ 271 to –276, which applies only to Bell Operating Companies (BOCs), all of which were formerly part of AT & T. Section 271 concerns the authority of BOCs to provide long distance services and provides, in general, that a BOC can only provide long distance services if it first meets certain requirements relating primarily to interconnection. 47 U.S.C. § 271(c).

that even if § 271 imposed an obligation to provide unbundled switching independent of § 251 with which BellSouth had failed to comply, § 271 explicitly places enforcement authority with the FCC, which may "(i) issue an order to such company to correct the deficiency; (ii) impose a penalty on such company pursuant to subchapter V of this chapter; or (iii) suspend or revoke such [company's] approval" to provide long distance service if it finds that the company has ceased to meet any of the conditions required for approval to provide long distance service. Thus, it is the prerogative of the FCC, and not this court, to address any alleged failure by BellSouth to satisfy any statutorily imposed conditions to its continued provision of long distance service.

■ Based on the foregoing, the court concludes that BellSouth has established a substantial likelihood that it will succeed on the merits of its claim.[11] The court also concludes that BellSouth has shown that it will suffer irreparable harm if injunctive relief is not granted. BellSouth has offered proof, unrefuted by the PSC or defendant intervenors, that it is losing more than 5,000 customers a month to UNE–Platform competitors. The opponents of BellSouth's motion argue that this loss can be adequately redressed by an award of monetary relief; yet as BellSouth points out, at the end of the case, this court cannot simply give BellSouth back the customers it has lost, and the monetary loss attending the loss of customers can be difficult, if not impossible to quantify. *See Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1449 (11th Cir.1991) (recognizing that the "Fifth Circuit has held that

the loss of customers and goodwill is an 'irreparable injury,' " and agreeing that where there has been a loss of a party's long-time customers, the injury is "difficult, if not impossible, to determine monetarily") (citations omitted). *See also BellSouth v. MCIMetro Access,* 2005 WL 807062, at *3 (finding that BellSouth had demonstrated the existence of "very significant immediate and irreparable injury"); *Illinois Bell Telephone Co. v. Hurley,* 2005 WL 735968, at *7 (agreeing with SBC that "it will suffer irreparable harm because, even if its losses are quantifiable, there is no entity against which SBC could recover money damages").

As for the issue of whether the threatened injury to BellSouth outweighs the threatened harm to the defendant intervenors, the court is persuaded that the competitors have alternative means of competing with BellSouth and that while "some competitive LECs may suffer harm in the short-term [if the requested injunction is granted], they will do so only if they intended to compete by engaging in conduct that the FCC has concluded is anticompetitive and contrary to federal policy." *BellSouth v. MCIMetro Access,* 2005 WL 807062 (observing that "paragraph 218 of the Order on Remand states that the UNE Platform 'hinder[s] the development of genuine, facilities-based competition,' contrary to the federal policy reflected in the Telecommunications Act of 1996."); *see also* State Corp. Commission of Kansas, *Order Granting in Part and Denying in Part Formal Complaint and Motion for Expedited Order,* Dkt. No. 04–SWBT–763–GIT (March 10, 2005) (stating that "any harm claimed by the CLECs to be irrepa-

---

11. As did the Georgia court in *BellSouth v. MCIMetro Access,* 2005 WL 807062, in concluding that BellSouth has sustained its burden as to the first requisite for injunctive relief, the court "does not reach the issue whether an 'Abeyance Agreement' between

BellSouth and [Nuvox, KMC and Xpedius] authorizes those defendants to continue placing new orders. That issue is pending before the PSC, and this Court's decision does not affect the PSC's authority to resolve it."

rable today is no different from the harm that they must inevitably face in the relatively short term as a result of implementing the FCC's new rules. On the other hand, the sooner the FCC's new rules can be implemented, the sooner rules held to be illegal can be abrogated.").[12]

The fourth and final requisite for injunctive relief requires that BellSouth demonstrate that granting the preliminary injunction will not disserve the public interest. The FCC determined in its Order that there is a strong public interest in "providing ... consumers with the technical innovation and competition which the FCC has predicted will result from the elimination of mandated unbundled switching," and indeed, it specifically declared that it would be "contrary to the public interest" to delay the effectiveness of its order. TRRO ¶ 236. The court is unpersuaded that there is a sufficient countervailing public interest to warrant denial of BellSouth's motion.

*Conclusion*

Based on the foregoing, it is ordered that BellSouth's motion for preliminary injunction is granted and the PSC is precluded from enforcing that part of its order requiring BellSouth to continue to process new orders for UNE–P switching.

---

**12.** The court would further note that the competitive LECs have been on notice since at least August 2004 of the possibility that a time would soon come when they would be precluded from placing new orders for switching UNEs. *See Order and Notice of Proposed Rulemaking, Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* 19 FCC Rcd 16783, ¶ 29 (2004) (proposing a transition plan that "does not permit competitive LECs to add new customers").