**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

QWEST CORPORATION,
              *Plaintiff-Appellee,*

v.

ARIZONA CORPORATION COMMISSION;
JEFF HATCH-MILLER, in his official
capacity as Chairman of the
Arizona Corporation Commission;
MIKE GLEASON, in his official
capacity as a member of the
Arizona Corporation Commission;
KRISTIN K. MAYES, in her official
capacity as a member of the
Arizona Corporation Commission;
WILLIAM A. MUNDELL, in his
official capacity as a member of
the Arizona Corporation
Commission; MARC SPITZER, in his
official capacity as a member of
the Arizona Corporation
Commission; DIECA
COMMUNICATIONS, doing business
as Covad Communications
Company,
              *Defendants-Appellants.*

No. 07-17079

D.C. No.
CV-06-01030-ROS

OPINION

6777

QWEST CORPORATION,
                    *Plaintiff-Appellee,*

v.

ARIZONA CORPORATION COMMISSION;
JEFF HATCH-MILLER, in his official
capacity as Chairman of the
Arizona Corporation Commission;
MIKE GLEASON, in his official
capacity as a member of the
Arizona Corporation Commission;
KRISTIN K. MAYES, in her official
capacity as a member of the
Arizona Corporation Commission;
WILLIAM A. MUNDELL, in his
official capacity as a member of
the Arizona Corporation
Commission; MARC SPITZER, in his
official capacity as a member of
the Arizona Corporation
Commission; DIECA
COMMUNICATIONS, doing business
as Covad Communications
Company,
                    *Defendants-Appellants.*

No. 07-17080

D.C. No.
CV-06-01030-ROS

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted
April 15, 2009—San Francisco, California

Filed June 8, 2009

Before: Dorothy W. Nelson and Richard R. Clifton,
Circuit Judges, and Samuel P. King,* District Judge.

Opinion by Judge Clifton

---

*The Honorable Samuel P. King, Senior United States District Judge
for the District of Hawaii, sitting by designation.

## COUNSEL

Christopher C. Kempley and Maureen A. Scott (argued), Arizona Corporation Commission Legal Division, Phoenix, Arizona; John Matthew Derstine and Michael Patten, Roshka DeWulf & Patten, Phoenix, Arizona; Gregory T. Diamond, General Counsel for Covad Communications Company, Denver, Colorado; Jason M. Wakefield (argued), San Jose, California, for the defendants-appellants.

John Michael Devaney (argued), Perkins Coie, Washington, D.C.; Steven J. Monde, Perkins Coie Brown & Bain, Phoenix, Arizona, for the plaintiff-appellee.

Paul K. Mancini, San Antonio, Texas; Michael E. Glover, Arlington, Virginia; Colin S. Stretch, Scott H. Angstreich, and Kelly P. Dunbar (argued), Kellogg, Huber, Hansen, Todd, Evans & Figel, Washington, D.C., for amici curiae AT&T, Inc. and Verizon.

**OPINION**

CLIFTON, Circuit Judge:

The Telecommunications Act of 1996 ("Act" or "1996 Act"), Pub. L. 104-104, 110 Stat. 56 (codified in part at 47 U.S.C. §§ 251-261, 271), created a complex federal scheme to encourage competition in local telephone service markets previously dominated by state-sanctioned local exchange carrier monopolies. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371-72, 377-80 (1999). Sections 251 and 252 of the Act require former monopoly local carriers to enter into interconnection agreements that provide the new competitors with access to some of their telecommunications components on an unbundled basis and on terms favorable to the competitors. Meanwhile, Section 271 allows local phone companies that used to be subsidiaries of AT&T, previously barred by an antitrust decree from entering the long-distance market, to supply long-distance services if their interconnection agreements contain certain access provisions. The Act explicitly authorizes state commissions to play a crucial, but restricted, role in this process, while reserving the power to administer various parts of the Act exclusively to the Federal Communications Commission.

Section 252 of the Act invites carriers engaged in negotiating an interconnection agreement to petition a state commission to arbitrate unsettled issues. In this case, we address whether a state commission overstepped its authority in arbitrating the terms of an interconnection agreement. The Act's language, history, and purpose, in addition to the overwhelming majority of judicial and administrative decisions on the matter, persuade us that state commissions may not impose Section 271 access or pricing requirements in the course of arbitrating interconnection agreements. We further conclude that state commissions are preempted from forcing carriers to make parts of their networks available on a separately pur-

chasable basis when the FCC has determined that they are not required to do so.

The Arizona Corporation Commission ("ACC") and DIECA Communications, Inc., d/b/a Covad Communications Company, appeal the district court's entry of summary judgment in favor of Qwest Corporation in its action under the 1996 Act challenging the ACC's arbitration order. We affirm the district court's decision and hold that the Act bars the ACC from insisting Qwest's interconnection agreement with Covad include Section 271 access or pricing obligations or provide for element unbundling that the FCC has lifted.

## I.   Background

### A.   The Statutory Framework

Congress rang in a new era of telecommunications regulation with the passage of the Communications Act of 1934. At the time, AT&T controlled the long-distance telephone service market while its subsidiary Bell Operating Companies ("BOCs"), of which Qwest is a descendant, enjoyed a "virtual monopoly" over local telephone service.[1] S. Rep. No. 104-23,

---

[1]Telecommunications law embodies a host of acronyms. For ease of reference, we provide the following glossary of terms used in this opinion:

| | |
|---|---|
| ACC | Arizona Corporation Commission |
| Act or 1996 Act | Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56 (codified in part at 47 U.S.C. §§ 251-261, 271) |
| BOC | Bell Operating Company (*e.g.*, Qwest) |
| CLEC | Competitive Local Exchange Carrier (*e.g.*, Covad) |
| FCC | United States Federal Communications Commission |
| ILEC | Incumbent Local Exchange Carrier (*e.g.*, Qwest) |
| InterLATA service | Service between a defined Local Access Transport Area and an outside area (we refer to this as long-distance service, a rough approximation of the term) |
| TELRIC | Total Element Long-Run Incremental Cost pricing |

at 2 (1995). For the next 50 years, telephone service regulatory issues mainly revolved around rates, with the FCC setting interstate rates and state commissions setting intrastate rates. *Verizon New England, Inc. v. Maine Public Utils. Comm'n*, 509 F.3d 1, 4 (1st Cir. 2007).

In 1982, a federal antitrust consent decree was entered to promote competition in long-distance services by disconnecting AT&T from its subsidiary BOCs, which were in turn initially barred from dialing into the long-distance market. *See AT&T Corp.*, 525 U.S. at 413-15 (Breyer, J., concurring in part and dissenting in part); *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 222-25 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983) (mem.); *see also SBC Commc'ns, Inc. v. FCC*, 138 F.3d 410, 412 (D.C. Cir. 1998) ("Divestiture was called for, in large part, because it was thought that a corporation that enjoyed a monopoly on local calls would ineluctably leverage that bottleneck control in the interexchange (long distance) market." (internal quotation marks omitted)). The framers of the decree envisioned a dual telephone service universe: AT&T was expected to compete with new entrants in the long-distance market, and the BOCs would continue as local service monopolies.[2] *Verizon New England*, 509 F.3d at 3-4.

"The retreat from this illusion of wholly separate spheres

---

|          | methodology |
|----------|-------------|
| UNEs     | Section 251(c)(3) Unbundled Network Elements |

[2]"Until the 1990's, local phone service was thought to be a natural monopoly. States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network." *AT&T Corp.*, 525 U.S. at 371.

began in earnest with the 1996 Telecommunications Act." *Id.* at 4. The BOCs wanted to provide long-distance services, while established and new long-distance carriers alike wanted to gain "access to local BOC facilities to use for long distance services, competing local services, or both." *Id.* "The 1996 Act established a complex regulatory regime for both entry and competition in both spheres." *Id.* Under the Act, BOCs and other incumbent local exchange carriers ("ILECs")[3] must provide competitive local exchange carriers ("CLECs") access to certain elements of their local facilities. BOCs, meanwhile, are permitted to enter the long-distance market if certain prerequisites are met.

Sections 251 and 252 of the 1996 Act define the required access to ILEC facilities, while Section 271 speaks to long-distance entry conditions for BOCs. The overlap between these two parts of the Act sends a mixed message as to what regulatory authority state commissions retain.

Specifically, Section 251(a)(1) compels every telecommunications carrier "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." Section 251(c)(1) requires an ILEC like Qwest to engage in good faith negotiations with a CLEC like Covad to form an interconnection agreement to fulfill the various duties imposed on all local exchange carriers under Section 251(b).[4]

---

[3]BOCs are a subset of ILECs. That is, all BOCs are ILECs, but not all ILECs are BOCs. Thus, Qwest — a BOC — is also an ILEC.

[4]Section 251(b) imposes the following five competition-fostering duties: "(1) Resale[:] The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services[;] (2) Number portability[:] The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission[;] (3) Dialing parity[:] The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing, with no

Section 251(c)(3) also requires ILECs to offer CLECs certain "network elements"[5] on an unbundled basis at cost-based, regulated rates. These unbundled network elements are commonly referred to as "UNEs." The FCC designates UNEs by determining if access to a given UNE is "necessary" and if the failure to provide such access would "impair" CLECs in providing services. 47 U.S.C. § 251(d)(2); *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 531-32 (D.C. Cir. 2006); *see also U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 568 (D.C. Cir. 2004) (concluding the FCC cannot delegate the authority to classify UNEs to state commissions). The FCC shortened its list of mandatory UNEs in 2005 following a series of D.C. Circuit cases holding that the FCC's impairment standard was overly broad. *See Covad Commc'ns Co.*, 450 F.3d at 533-37. State commissions set UNE rates by applying the FCC's Total Element Long-Run Incremental Cost (TELRIC) pricing methodology. 47 U.S.C. § 252(d)(1); *see Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 523 (2002) (upholding the FCC's TELRIC rate regulations); 47 C.F.R. §§ 51.503, 51.505; Local Competition Order ¶ 672, 11 F.C.C.R. 15499, 15844 (1996). These below-market TELRIC prices are highly favorable to CLECs.[6]

---

unreasonable dialing delays[;] (4) Access to rights-of-way[:] The duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 of this title[;] [and] (5) Reciprocal compensation[:] The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b).

[5]A "network element" refers to "a facility or equipment used in the provision of a telecommunications service." 47 U.S.C. § 153(29).

[6]The FCC defines TELRIC pricing of an element as "the forward-looking cost over the long run of the total quantity of the facilities and functions that are directly attributable to, or reasonably identifiable as incremental to, such element, calculated taking as a given the incumbent LEC's provision of other elements." 47 C.F.R. § 51.505(b).

Section 252(a) permits carriers to negotiate an interconnection agreement voluntarily without regard to the duties otherwise imposed under Section 251(b) or (c). If, like here, negotiations fail, pursuant to Section 252(b)(1) either party "may petition a State commission to arbitrate any open issues." The state commission may only consider issues identified in the arbitration petition and must ensure Section 251 requirements are met. 47 U.S.C. § 252(b)(4)(A), (c). All interconnection agreements, whether adopted through negotiation or arbitration, must be submitted to the appropriate state commission for approval.[7] 47 U.S.C. § 252(e)(1).

Section 271 only applies to those ILECs like Qwest that are, or incorporate, former BOCs. Section 271(c) allows BOCs to provide "interLATA services" (roughly meaning long-distance services) only if two conditions are met: First, the BOC must either have in place an interconnection agreement approved under Section 252 or, if no CLEC has requested such an agreement, it must have filed a statement of generally available terms approved by the state commission under Section 252(f). *See* 47 U.S.C. § 271(c)(2)(A). Second, independent of Section 251(c)(3) UNE duties, the BOC must make a statutorily-specified list of elements available on an unbundled basis in addition to complying with Section 251 and other requirements set forth in the "competitive checklist."[8]

---

[7]If a state commission chooses not to carry out its assigned role under the Act, the FCC assumes the responsibility. 47 U.S.C. § 252(e)(5); *see also* Jennifer L. Greenblatt, *What's Dignity Got to Do with It?: Using Anti-Commandeering Principles to Preserve State Sovereign Immunity*, 45 Cal. W. L. Rev. 1, 14-15 (2008) (discussing Supreme Court precedent barring Congress from forcing state executive officers to administer federal law).

[8]The 14-point competitive checklist requires interconnection agreements or a statement of generally available terms to include, in relevant part:

(i) Interconnection in accordance with the requirements of sections 251(c)(2) and 252(d)(1) of this title.

*See* 47 U.S.C. § 271(c)(2)(B). In contrast to Section 251 UNEs, the FCC decided "network elements that are unbundled by BOCs solely because of the requirements set forth in section 271" do not have to be offered at cost-based rates. Triennial Review Order ("*TRO*") ¶¶ 656-64, 18 F.C.C.R. 16978, 17386-89 (2003) (concluding "the basic just, reasonable, and nondiscriminatory rate standard of sections 201 and 202" and not "the section 252(d)(1) pricing standard" applies to Section 271 checklist network elements); *see U.S. Telecom Ass'n*, 359 F.3d at 588-90. In practical terms, that means BOCs like Qwest can charge higher rates for elements unbundled under Section 271 than they could if the cost-based approach to rates for elements unbundled under Section 251 applied.

## B.    Procedural History

Pursuant to Sections 251 and 252 of the Act, Covad entered into negotiations with Qwest to secure an interconnection agreement. A complete agreement was not reached, so in accordance with Section 252, Covad petitioned the ACC to

---

(ii) Nondiscriminatory access to network elements in accordance with the requirements of sections 251(c)(3) and 252(d)(1) of this title.

. . .

(iv) Local loop transmission from the central office to the customer's premises, unbundled from local switching or other services.

(v) Local transport from the trunk side of a wireline local exchange carrier switch unbundled from switching or other services.

[and]

(vi) Local switching unbundled from transport, local loop transmission, or other services.

. . .

47 U.S.C. § 271(c)(2)(B).

arbitrate several disputed interconnection agreement issues. Adopting the recommendations of an administrative law judge, the ACC issued an arbitration order resolving the disputed interconnection agreement issues.

The ACC's order interpreted the Section 252 approval process as authorizing it to require that Section 271 elements be placed in arbitrated interconnection agreements. The ACC also held it had "jurisdiction to impose unbundling requirements under Arizona law that the [FCC's] *TRO* or [the D.C. Circuit's] *USTA II* decisions struck down." Finally, the ACC ruled that the previous ACC-approved cost-based rates would remain in effect for Section 271 elements pending a further proceeding within 30 days to set "just and reasonable rates consistent with state and federal law."

Qwest and Covad filed their arbitrated interconnection agreement implementing the terms of the arbitration decision with the ACC, which was approved by operation of law under Section 252(e)(4). One of the arbitrated interconnection agreement provisions stated "Qwest will continue providing access to certain network elements as required by Section 271 or state law, regardless of whether access to such UNEs is required by Section 251 of the Act." The ACC deferred holding the Section 271 rate proceeding at Qwest's and Covad's request after they reached an interim agreement regarding the pricing issue.

Qwest brought this action in federal district court under the Act seeking declaratory and injunctive relief from the ACC's arbitration resolution. Treating the parties' briefs as cross-motions for summary judgment, the district court ruled in favor of Qwest. The court held that the ACC has no power to enforce Section 271 obligations. The court concluded that because the ACC lacks authority to arbitrate Section 271 terms, it cannot set prices for those elements and may not use the cost-based pricing scheme the FCC rejected regardless. The court decided that conflict preemption prohibits the ACC

from imposing unbundling requirements under Arizona law that the FCC explicitly withdrew. The ACC and Covad both timely appealed.

## II.   Discussion

"We review the district court's grant of summary judgment de novo." *US West Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117 (9th Cir. 1999). Like the district court, we review de novo whether the ACC's arbitration orders are consistent with the 1996 Act and its implementing regulations. *See Pacific Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1123 n.8 (9th Cir. 2003).

### A.    State Authority Under Section 271

[1] We join the First, Seventh, Eighth, and Eleventh Circuits in holding that the Act does not authorize state commissions to implement Section 271 terms and rates in interconnection agreements.[9] *See Verizon New England*, 509 F.3d at 7 (concluding the authority to determine which elements BOCs are required to provide under Section 271 and the rates for those elements "is granted exclusively to the FCC"); *Illinois Bell Tel. Co., Inc. v. Box*, 548 F.3d 607, 613 (7th Cir. 2008) ("[T]he state commission's power over [an interconnection] agreement is limited to the terms in the agreement relating to access under section 251."); *Southwest-*

---

[9]Numerous federal district courts in other circuits have similarly decided that state commissions do not possess power to determine or enforce Section 271 requirements. *See, e.g.*, *Michigan Bell Tel. Co. v. Lark*, No. 06-11982, 2007 WL 2868633, at *6 (E.D. Mich. Sept. 26, 2007); *BellSouth Telecomms., Inc. v. Kentucky Public Serv. Comm'n*, No. 06-65-KKC, 2007 WL 2736544, at *6-*7 (E.D. Ky. Sept. 18, 2007); *Bell-South Telecomms., Inc. v. Mississippi Public Serv. Comm'n*, 368 F. Supp. 2d 557, 565-66 (S.D. Miss. 2005). In fact, the only federal court to reach a contrary conclusion was promptly reversed. *Verizon New England, Inc. v. Maine Public Utils. Comm'n*, 441 F. Supp. 2d 147, 156-58 (D. Me. 2006), *vacated*, 509 F.3d 1 (1st Cir. 2007).

*ern Bell Tel., L.P. v. Missouri Public Serv. Comm'n*, 530 F.3d 676, 682-83 (8th Cir. 2008) (rejecting the claim that "states have implied authority to ensure ILECs comply with § 271" in interconnection agreement arbitration proceedings); *Bell-South Telecomms., Inc. v. Georgia Public Serv. Comm'n*, ___ F.3d ___, 2009 WL 368527 (11th Cir. Jan. 26, 2009) (per curiam) (deciding state commissions are not authorized to implement Section 271). As the First Circuit explained in addressing an analogous claim, the contrary position the ACC and Covad have taken "is at odds with the statutory language, history and policy of section 271 and most relevant precedent."[10] *Verizon New England*, 509 F.3d at 7.

[2] The structure of Section 271 confirms that the FCC possesses sole authority to determine the access and pricing preconditions BOCs must satisfy to enter the long-distance services market. BOCs submit their application to provide interLATA services directly to the FCC. 47 U.S.C. § 271(d)(1). The FCC then consults with the Attorney General, whose evaluation of the application must be given "substantial weight." 47 U.S.C. § 271(d)(2)(A). The FCC must also "consult" with the state commission "to verify" that the BOC has complied with the requirements of Section 271(c). 47 U.S.C. § 271(d)(2)(B); *see also SBC Commc'ns*, 138 F.3d at 416 ("Although the Commission must consult with the State commissions, the statute does not require the FCC to give the State commissions' views any particular weight."). Finally, the FCC decides whether the BOC meets Section 271(c)'s terms and issues a written determination approving

---

[10]Our decision coincides with the FCC's own articulation of its absolute power under Section 271 as well as the stance taken by a majority of state commissions. *See* InterLATA Boundary Order ¶ 18, 14 F.C.C.R. 14392, 14401 (1999) (alluding to "the exclusive authority that Congress intended that the [*FCC*] exercise over the section 271 process" (emphasis added)). *Verizon New England*, 509 F.3d at 8 ("Most of the state commissions that have spoken appear to disclaim power to determine section 271 elements or fix pricing principles."*).*

or rejecting the interLATA application. 47 U.S.C. § 271(d)(3).

Once an interLATA application is approved, enforcement responsibilities rest exclusively with the FCC. It is the FCC that determines whether a BOC "has ceased to meet any of the conditions required for [interLATA service] approval," and it "may" issue orders, impose penalties, or retract its approval in response. 47 U.S.C. § 271(d)(6)(A). The FCC also "establish[es] procedures for the review of complaints" of BOC noncompliance with Section 271(c)'s approval conditions. 47 U.S.C. § 271(d)(6)(B). And the FCC is the one obligated to "act on such complaint within 90 days." *Id.*

**[3]** The ACC's limited Section 271 consultation role cuts against holding that it may impose Section 271 terms based on its authority under Section 252. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and alterations omitted)); *Verizon New England*, 509 F.3d at 7 ("That the states have an explicit consultative role under section 271 works against, rather than for, their claim of other powers."). The fact that the FCC is expressly prohibited from extending or limiting Section 271's competitive checklist terms "by rule or otherwise" likewise presupposes the FCC alone has the power to administer Section 271. 47 U.S.C. § 271(d)(4).

**[4]** Section 252's framework also undermines the ACC's claim of power to impose Section 271 requirements. A state commission may only arbitrate issues after an ILEC receives a request for negotiation "pursuant to section 251." *See* 47 U.S.C. § 252(a)(1), (b)(1); *see also Qwest Corp. v. Public Utils. Comm'n of Colorado*, 479 F.3d 1184, 1197 (10th Cir. 2007) ("[A] CLEC may only compel arbitration of issues that the ILEC is under a duty to negotiate pursuant to

§ 251(c)(1).”); *MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.*, 298 F.3d 1269, 1274 (11th Cir. 2002) (per curiam) (concluding that a state commission’s arbitration authority is coextensive with the ILEC’s duty to negotiate the terms and conditions necessary to fulfill Section 251 duties). Section 252(c), defining the “standards for arbitration,” explicitly requires state commissions to ensure *Section 251* requirements are met, without mentioning Section 271. The state commission must also “establish any rates for interconnection, services, or network elements according to [Section 252](d) . . . .” 47 U.S.C. § 252(c)(2). Section 252(d), meanwhile, only authorizes the setting of “just and reasonable rate[s]” for facilities and services offered pursuant to *Section 251*. Section 252(e)(2)(B) allows a state commission to reject an arbitrated agreement *only if* the agreement does not meet the requirements of *Section 251*. In short, all state commission arbitration authority under Section 252 is inextricably tied to the duties imposed under Section 251.

**[5]** Implementing other federal law requirements is beyond the scope of Section 252’s authority savings clause, which states that “nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with *intrastate* telecommunications service quality standards or requirements.” 47 U.S.C. § 252(e)(3) (emphasis added); *see also* 47 U.S.C. § 252(f)(2) (providing a nearly identical savings clause for state commissions reviewing statements of generally available terms); *accord SBC Commc’ns*, 138 F.3d at 417 (“[I]nterLATA service is typically *interstate*.”). Perhaps most tellingly, Section 271 contains no similar state commission authority savings clause. *See Verizon New England*, 509 F.3d at 7 (“Section 271 has no such clause reserving state power, again underscoring intended federal supremacy and the absence of state power under section 271.”).

**[6]** Nor is there any historical support for the ACC’s interpretation of its power to implement Section 271. Suits chal-

lenging the authority of state commissions to impose Section 271 access and pricing terms did not arise until 2005 because the FCC's previous expansive interpretation of Section 251(c)(3)'s UNE requirements coincided with Section 271(c)'s requirements. *See Southwestern Bell Tel.*, 530 F.3d at 681. Moreover, the 1996 Act was passed, in part, to address the concern that "the huge telecommunications industry should no longer be governed by an antitrust consent decree administered by a single federal district judge." *SBC Commc'ns*, 138 F.3d at 412-13. "When the 1996 Act replaced the decree, Congress aimed to transfer this authority to the FCC — not the states[.]" *Verizon New England*, 509 F.3d at 8.

### B.    State Law Authority

While Arizona law grants the ACC broad powers to make unbundling and pricing determinations, federal preemption restricts that power here. We conclude that, due to conflict preemption, state law cannot empower state commissions to prescribe or fix rates for Section 271 terms or institute unbundling requirements previously abolished by the FCC. *See AT&T Corp.*, 525 U.S. at 378 n.6 ("[I]f the federal courts believe a state commission is not regulating in accordance with federal policy they may bring it to heel.").

**[7]** Even though the Act does not contain an express preemption command, "a federal statute implicitly overrides state law . . . when state law is in actual conflict with federal law." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). This so-called conflict preemption is found "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted). In deciding whether the ACC's order " 'stands as an obstacle' to the full implementation of the [Act], it is not enough to say that the ultimate goal of both federal and state law is [the same]." *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). Rather, "[a] state law

also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." *Id.* "[B]ecause of the long history of federal presence in regulating long-distance telecommunications[,]" the ordinary presumption against finding preemption does not apply. *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003).

**[8]** The imposition of Section 271 requirements by the ACC under state law is preempted as it "interferes with Congress' chosen method in effectuating the purposes of the [Act]." *See Ting*, 319 F.3d at 1146; *accord Pacific Bell*, 325 F.3d at 1126 ("It is clear from the structure of the Act . . . that the authority granted to state regulatory commissions is confined to the role described in § 252 — that of arbitrating, approving, and enforcing interconnection agreements."). Congress "unquestionably" took "regulation of local telecommunications competition away from the States . . . [w]ith regard to the matters addressed by the 1996 Act[.]" *AT&T Corp.*, 525 U.S. at 378 n.6. The Act restricts the ACC to serving a limited consultation role while granting the FCC exclusive power to determine and enforce Section 271 compliance. 47 U.S.C. § 271(d); *see also BellSouth Telecomms., Inc. v. Georgia Public Serv. Comm'n*, 587 F. Supp. 2d 1258, 1264 (N.D. Ga. 2008), *aff'd*, ___ F.3d ___, 2009 WL 368527 (11th Cir. Jan. 26, 2009) ("[Although] Congress reserved some state authority to impose unbundling requirements that parallel the obligations of § 251, *see* 47 U.S.C. § 251(d)(3), that provision is expressly limited to implementation of § 251, and § 271 contains no similar savings clause, strongly signaling Congress's expectation that state commissions would not exercise independent state-law authority with respect to § 271 checklist items."); *MCI Telecomm. Corp. v. Bell Atlantic-Pennsylvania*, 271 F.3d 491, 510 (3d Cir. 2001) ("Regulating local telecommunications competition under the 1996 Act . . . is an activity in which states and state commissions are not entitled to engage except by the express leave of Congress.").

**[9]** We agree with the First, Seventh, and Eleventh Circuits that the Act preempts state commissions from imposing TEL-

RIC rates for Section 271 elements. *See Verizon New England*, 509 F.3d at 9 (deciding preemption principles force such state orders to give way since "[t]o allow the states to require the lower TELRIC rates directly conflicts with, and undercuts, the FCC's orders"); *Illinois Bell Tel. Co.*, 548 F.3d at 612-13 (finding "a real conflict between the federal and state regulatory schemes" when the state commission required the BOC to charge rates no higher than cost for Section 271 unbundled services); *BellSouth Telecomms.*, 587 F. Supp. 2d at 1264, *aff'd*, ___ F.3d ___, 2009 WL 368527 (11th Cir. Jan. 26, 2009) (holding the state commission's decision forcing a BOC to charge regulated rates for Section 271 "checklist items cannot be reconciled with the FCC's statements"); *see also supra* note 6 and accompanying text (discussing TELRIC below-market pricing).

**[10]** The FCC has determined that the market rate, rather than "the section 252(d)(1) pricing standard" (*i.e.*, TELRIC pricing), applies to Section 271 elements. *TRO* ¶¶ 656-64, 18 F.C.C.R. 16978, 17386-89; UNE Remand Order ¶ 473, 15 F.C.C.R. 3696, 3906 (1999) ("In circumstances where a checklist network element is no longer unbundled [under Section 251(c)(3)] . . . it would be counterproductive to mandate that the incumbent offers the element at forward-looking prices. Rather, the market price should prevail, as opposed to a regulated rate . . . ."); *see also Illinois Bell Tel. Co.*, 548 F.3d at 612 (proclaiming "the FCC allows the market rate to be charged" under Section 271); *Nuvox Commc'ns, Inc. v. BellSouth Comm'ns, Inc.*, 530 F.3d 1330, 1335 (11th Cir. 2008) (per curiam) ("[I]LECs are permitted to charge market rates for section-271 elements . . . ."). Moreover, the FCC has explained that "[w]hether a particular [Section 271] checklist element's rate satisfies the just and reasonable pricing standard of section 201 and 202 is a fact-specific inquiry that the [*FCC*] will undertake in the context of a BOC's application for section 271 authority or in an enforcement proceeding brought pursuant to section 271(d)(6)." *TRO* ¶ 664, 18 F.C.C.R. 16978, 17389 (emphasis added).

**[11]** We further hold that the ACC's claim of "jurisdiction to impose unbundling requirements under Arizona law that the *TRO* or *USTA II* decisions struck down" is also subject to conflict preemption. In accordance with the decisions of the First and Seventh Circuits, we conclude that the ACC's order stands "in direct conflict with specific FCC policies adopted pursuant to its authority under the 1996 Act." *Verizon New England*, 509 F.3d at 9 ("The problem for the states is the FCC's delisting was intended to free the carriers from such compulsion."); *Illinois Bell Tel. Co.*, 548 F.3d at 611 (opining that state commissions cannot "in effect . . . overrule the FCC's decision not to require additional unbundling at the [ILEC's] cost"); *see also id.* ("The FCC has been charged by Congress with determining the optimal amount of unbundling — enough to enable [CLECs] to compete with [ILECs] but not so much as to enable them to take an almost free ride on services that [ILECs] ha[ve] spent a lot of money to create. That judgment . . . is without force if a state can require more unbundling at cost than the FCC requires."); *TRO* ¶ 658, 18 F.C.C.R. 16978, 17387 (2003) ("We . . . decline to use section 271 . . . to broaden the unbundling obligations of section 251.").

The ACC points to Section 251(d)(3)'s savings clause, which states the FCC cannot "preclude the enforcement of any regulation, order, or policy of a State commission that — (A) establishes access and interconnection obligations of local exchange carriers; (B) is consistent with the requirements of this section; and (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part." Holding that preemption bars the ACC from imposing FCC-revoked requirements comports with this savings clause as "the access requirements imposed by the [ACC] *are* inconsistent with the requirements of section 251 and *do* prevent their implementation." *See Illinois Bell Tel. Co.*, 548 F.3d at 611; *see also* 47 U.S.C. § 251(d)(2) (directing the FCC to determine which network elements must be unbundled); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870

(2000) ("[The Supreme] Court has repeatedly declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law." (internal quotation marks and alterations omitted)); *Verizon New England*, 509 F.3d at 9 ("For a state to require such sharing where the FCC thinks compulsion is detrimental is no different than insistence on TELRIC pricing in contravention of the FCC's mandate for a different pricing scheme.").

## III.    Conclusion

**[12]** In sum, we hold that the Act does not authorize the ACC to impose Section 271 access or pricing terms and that conflict preemption bars the ACC from doing so under state law. Preemption further restricts the ACC from using state law to order the unbundling of elements the FCC expressly declined to unbundle under Section 251. Accordingly, we affirm the district court's decision.

**AFFIRMED.**