RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

BELLSOUTH TELECOMMUNICATIONS, INC.,
dba AT&T Kentucky,
      *Plaintiff-Appellee/Cross-Appellant,*

      *v.*

KENTUCKY PUBLIC SERVICE COMMISSION;
DAVID L. ARMSTRONG, in his official
capacity as Chairman of the Public Service
Commission; JAMES W. GARDNER, in his
official capacity as Vice Chairman of the
Public Service Commission; CHARLIE
BORDERS, in his official capacity as
Commissioner of the Public Service
Commission,
      *Defendants-Appellants/Cross-Appellees.*

Nos. 10-5310/5311

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 08-00007—Danny C. Reeves, District Judge.

Argued: October 6, 2011

Decided and Filed: January 24, 2012

Before: KEITH, SUTTON and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John E. B. Pinney, KENTUCKY PUBLIC SERVICE COMMISSION, Frankfort, Kentucky, for Appellants. Brendan J. Crimmins, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for Appellee. **ON BRIEF:** John E. B. Pinney, Tiffany J. Bowman, KENTUCKY PUBLIC SERVICE COMMISSION, Frankfort, Kentucky, for Appellants. Brendan J. Crimmins, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., Mary K. Keyer, BELLSOUTH TELECOMMUNICATIONS, INC., Louisville, Kentucky, for Appellee. Maureen K. Flood, Richard K. Welch, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Amicus Curiae.

———————————

## OPINION

———————————

SUTTON, Circuit Judge.  This case arises from efforts of the Kentucky Public Service Commission to enforce several provisions of the Telecommunications Act of 1996, its accompanying regulations and state law.  AT&T Kentucky argues, and the district court held, that the state commission wrongly interpreted two of the federal regulations and is preempted from using state law to impose other obligations.  AT&T Kentucky also cross-appeals the district court's interpretation of a third federal regulation.  We affirm.

### I.

"The Telecommunications Act of 1996 imposed a number of duties on incumbent providers of local telephone service in order to facilitate market entry by competitors." *Talk America, Inc. v. Mich. Bell Tel. Co.*, 564 U.S. ___, 131 S. Ct. 2254, 2257 (2011). This case concerns two sections of the Act:  § 251 and § 271.  Section 251 requires incumbent local exchange carriers to lease to new market entrants (often referred to as "competitive LECs") the facilities and services that the FCC determines are necessary to provide local telephone service.  *See id.* at 2258; 47 U.S.C. §§ 251(c)(3), (d)(2). Incumbent LECs must provide these facilities and services (often referred to as "network elements") on an "unbundled"—à la carte—basis and at a low, cost-based rate known as TELRIC.  *See* 47 U.S.C. § 251(c)(3); *Verizon Commc'ns v. FCC*, 535 U.S. 467, 495–96 (2002).

Unlike § 251, which applies to all incumbent LECs, § 271 imposes its obligations only on "Bell operating compan[ies]"—remnants of AT&T after the government broke up the company in the early 1980s—that seek to provide long-distance service.  47 U.S.C. § 271.  AT&T Kentucky is one such company.  Section 271 requires Bell companies to make available to other telecommunications companies a "competitive

checklist" of services to facilitate competition in the market for local phone service. *Id.*
§ 271(c)(2)(B).

Soon after passage of the 1996 Act, the FCC required incumbent LECs to lease out, under § 251, all of the network elements necessary for competitors to provide local service. Because the key items on the § 271 competitive checklist were already available at TELRIC rates under § 251, the list played little role. Beginning in 2003, the FCC decided that incumbent LECs no longer needed to provide certain network elements under § 251, because competitive LECs could construct their own or buy them on the open market. *See Triennial Review Order* ("*TRO*"), 18 FCC Rcd. 16978 (2003), *vacated and remanded in part*, *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004); *Triennial Review Remand Order*, 20 FCC Rcd. 2533 (2005). This development gave new relevance to the § 271 competitive checklist, which now imposed some requirements on Bell companies that the FCC no longer imposed under § 251.

In response to these regulatory developments, some competitive LECs in Kentucky asked the state commission to require AT&T to continue to provide them with the newly de-listed elements. The state commission agreed, but a district court enjoined it from enforcing the order. *See BellSouth Telecomms., Inc. v. Cinergy Commc'ns Co.*, No. 3:05-CV-16-JMH, 2006 WL 695424 (E.D. Ky. Mar. 20, 2006). Undaunted, the commission tried again, this time invoking § 271. The district court rejected this effort too, on the ground that state commissions have "no authority to act pursuant to § 271." *BellSouth Telecomms., Inc. v. Ky. Pub. Serv. Comm'n*, No. 06-65-KKC, 2007 WL 2736544, at *7 (E.D. Ky. Sept. 18, 2007). The district court twice ordered the state commission to calculate the amount of damages a competitive LEC owed to AT&T for services it had obtained at the unlawfully imposed rate. *Id.* at *10; *BellSouth Telecomms., Inc. v. Ky. Pub. Serv. Comm'n*, 613 F. Supp. 2d 903, 907 (E.D. Ky. 2009). The state commission instead issued yet another order, invoking its state law authority to require AT&T to provide de-listed network elements at a regulated (though not a TELRIC) rate, and imposed other requirements under its interpretation of FCC regulations implementing the 1996 Act. AT&T returned once more to district court,

seeking an injunction against the new order, which the court in large part granted. *BellSouth Telecomms., Inc. v. Ky. Pub. Serv. Comm'n*, 693 F. Supp. 2d 703 (E.D. Ky. 2010).

The state commission appeals three of the district court's conclusions: (1) that the commission may not require the continued unbundling of facilities and services the FCC has de-listed; (2) that FCC regulations do not require AT&T to provide to competitive LECs a piece of equipment known as a line splitter; and (3) that FCC regulations do not require AT&T to provide unbundled access to certain high-speed fiber-optic loops in new service areas. AT&T cross-appeals the district court's determination that it must commingle—package together—unbundled network elements it provides under § 251 with de-listed elements that it provides under § 271.

II.

A.

May the state commission require the unbundling of facilities and services that the FCC has determined no longer need to be unbundled under § 251? No. The commission identifies two sources of law that purport to give it the authority to do so: 47 U.S.C. § 271 and Ky. Rev. Stat. §§ 278.030, 278.040. Neither one does the trick.

*Section 271.* As a Bell operating company, AT&T must comply with the requirements of § 271, including those requirements that the FCC has removed from the purview of § 251. But the authority of state regulatory commissions under § 271 is limited. The FCC alone enforces § 271, subject only to the requirement that it "consult" with state commissions "to verify the compliance of the Bell operating company" with the statute's substantive mandates. 47 U.S.C. §§ 271(d)(2)(B), (d)(6). None of this gives state commissions authority to enforce § 271, as every federal court of appeals to consider the issue has concluded. *See Verizon New England, Inc. v. Maine Pub. Utils. Comm'n*, 509 F.3d 1, 7–8 (1st Cir. 2007); *Ill. Bell Tel. Co. v. Box*, 548 F.3d 607, 613 (7th Cir. 2008); *Sw. Bell Tel., L.P. v. Mo. Pub. Serv. Comm'n*, 530 F.3d 676, 682–83 (8th Cir.

2008); *Qwest Corp. v. Ariz. Corp. Comm'n*, 567 F.3d 1109, 1116 (9th Cir. 2009); *BellSouth Telecomms., Inc. v. Ga. Pub. Serv. Comm'n*, 555 F.3d 1287, 1288 (11th Cir. 2009). If the commission thinks AT&T is not honoring its § 271 obligations, the 1996 Act gives the commission recourse: file a complaint with the FCC. *See* 47 U.S.C. § 271(d)(6)(B).

*State law*. The commission alternatively claims that state law, giving it the authority to set "fair, just and reasonable" rates, Ky. Rev. Stat. §§ 278.030 and 278.040, permits it to enforce the § 271 obligations. Yet when "state and federal law directly conflict," the state law must yield. *PLIVA, Inc. v. Mensing*, 564 U.S. ___, 131 S. Ct. 2567, 2577 (2011). That is the case here. "In circumstances where a checklist network element is no longer unbundled" under § 251, the FCC has determined that "it would be counterproductive to mandate that the incumbent offer[ ] the element at forward-looking prices. Rather, the market price should prevail as opposed to a regulated rate." *UNE Remand Order*, 15 FCC Rcd. 3696, 3906 ¶ 473 (1999). True, the commission has not imposed the TELRIC rate on the newly de-listed elements; it has imposed "fair, just, and non-discriminatory rates," which it describes as being "market based." R.43 Ex. 1 at 11. The FCC's regulation, however, bars the imposition of *any* rate other than the open-market rate, meaning that *any* price regulation by a state commission creates a conflict. Otherwise, why claim a right to impose the state-law rate? *See Illinois Bell*, 548 F.3d at 612 (noting that "the market rate *has* to be higher" than the "just and reasonable" rate the state commission set, "so there is a real conflict between the federal and state regulatory schemes").

The commission persists that it merely has imposed "service standards under [a] performance plan[ ]," Br. at 36, and that the FCC has said that performance plans, while not required, facilitate "monitoring and enforcement." *Georgia–Louisiana Order*, 17 FCC Rcd. 9018, 9181–82 ¶ 291 (2002). None of this, however, permits a state commission to "parlay its limited role" in making recommendations to the FCC in a performance plan into an attempt to regulate the terms of access to § 271 elements. *Ind. Bell Tel. Co. v. Ind. Util. Regulatory Comm'n*, 359 F.3d 493, 497 (7th Cir. 2004).

Nor do the Act's saving clauses, 47 U.S.C. §§ 252(e)(3) and 253(b), help the commission. Section 253(b) provides only that "[n]othing *in this section* shall affect the ability of a State to impose . . . requirements necessary to preserve and advance universal service." The preemptive force at issue springs from § 271 and the accompanying FCC regulations, not from § 253. Section 252(e)(3) likewise preserves a State's power to "establish[ ] or enforc[e] other requirements of State law in its review" of an interconnection agreement negotiated between an incumbent and a competitive LEC. But that power goes to whether an agreement complies with § 251, a matter beside the point here because the FCC has removed these elements from the scope of § 251. Section 271 has no parallel saving clause preserving State authority to regulate the Bell companies, which provides another indication Congress did not want state commissions to perform this task. *See Qwest*, 567 F.3d at 1117; *Verizon New England*, 509 F.3d at 7.

## B.

Do the FCC regulations require AT&T to provide competitive LECs with a line splitter? No.

Line splitting allows one competitive LEC to provide narrowband voice service over the low-frequency portion of a copper loop while a second competitive LEC provides digital subscriber line (DSL) service over the high-frequency portion of the loop. *See* 47 C.F.R. § 51.319(a)(1)(ii). A line splitter, no surprise, facilitates line splitting by dividing transmissions over the loop into two different frequencies.

Both sides agree that 47 C.F.R. § 51.319(a)(1) provides the controlling regulatory text. It reads in relevant part:

> (ii) Line splitting. An incumbent LEC shall provide a requesting telecommunications carrier that obtains an unbundled copper loop from the incumbent LEC with the ability to engage in line splitting arrangements with another competitive LEC using a splitter collocated at the central office where the loop terminates into a distribution frame or its equivalent. . . .

> (v) Control of the loop and splitter functionality.  In situations where a requesting telecommunications carrier is obtaining access to the high frequency portion of a copper loop either through a line sharing or line splitting arrangement, the incumbent LEC may maintain control over the loop and splitter equipment and functions, and shall provide to the requesting telecommunications carrier loop and splitter functionality that is compatible with any transmission technology that the requesting telecommunications carrier seeks to deploy using the high frequency portion of the loop . . . .

The key insight is a textual one.  Nowhere does the regulation require incumbent LECs to provide line splitters.  Subsection (ii) requires incumbent LECs to provide "the ability to engage in line splitting arrangements," not to provide the splitters themselves.  And subsection (v) mandates that in certain circumstances incumbents provide "loop and splitter functionality" that is "compatible with any transmission technology that the [competitive LEC] seeks to deploy," but it stops short of directing them to provide the equipment.

We are not the only ones to read the regulation this way.  The FCC has "never exercised its legislative rulemaking authority . . . to require incumbent LECs to provide access to the splitter, and incumbent LECs therefore have no current obligation to make the splitter available." *Texas Order*, 15 FCC Rcd. 18354, 18516 ¶ 327 (2000).  It instead "require[s] incumbent LECs to permit competing carriers to engage in line splitting where a competing carrier . . . provides its own splitter to be collocated in the central office." *TRO*, 18 FCC Rcd. at 17130 ¶ 251.  The word "collocated" confirms the point.  Collocation means that a competitive LEC "[p]lace[s] its own equipment . . . upon an incumbent LEC's premises," 47 C.F.R. § 51.5, showing that the regulation contemplates competitive LECs will supply their own splitters.

The commission stakes its response on the claim that a splitter is a network element that AT&T must provide in unbundled form under § 251.  *See* Br. at 44, 46–48.  But, in a word (or three), it is not.  The FCC determines what qualifies as an unbundled network element, *see* 47 U.S.C. § 251(d)(2); *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 391–92 (1999), and has never designated a splitter as one.  Nothing shows that the

capacity of competitive LECs to provide service would be "impair[ed]" without unbundled access to a splitter, 47 U.S.C. § 251(d)(2)(B), requiring them to obtain it on the open market. *See Illinois Bell*, 548 F.3d at 611–12. All AT&T must do under the Act is accommodate line splitting; it has no obligation to provide the splitter.

C.

Do the FCC regulations require AT&T to provide unbundled access to high-speed fiber-optic loops in previously unserved areas (often referred to as "greenfields")? No.

This issue turns on the meaning of three provisions of 47 C.F.R. § 51.319. The first says:

> New builds. An incumbent LEC is not required to provide nondiscriminatory access to a fiber-to-the-home loop or a fiber-to-the-curb loop on an unbundled basis when the incumbent LEC deploys such a loop to an end user's customer premises that previously has not been served by any loop facility.

47 C.F.R. § 51.319(a)(3)(ii). The other two provisions say:

> [A]n incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to a DS1 loop on an unbundled basis to any building not serviced by a wire center with at least 60,000 business lines and at least four fiber-based collocators. . . .

> [A]n incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to a DS3 loop on an unbundled basis to any building not served by a wire center with at least 38,000 business lines and at least four fiber-based collocators.

47 C.F.R. § 51.319(a)(4)(i), (a)(5)(i).

A few definitions are in order. A fiber-to-home loop connects directly to a business or residence, while a fiber-to-curb loop connects to a distribution site within 500 feet of a residence or business. *See* 47 C.F.R. § 51.319(a)(3)(i)(A)–(B). A DS1 loop is a digital loop with a total digital signal speed of 1.544 megabytes per second, while

a DS3 loop has a speed of 44.736 megabytes per second.    *See* 47 C.F.R.
§ 51.319(a)(4)(i), (a)(5)(i).

The rationale for these regulations is basic.  Incumbent LECs generally must
unbundle DS1 and DS3 loops because otherwise competitive LECs would be impaired
in their ability to provide service.  *See TRO*, 18 FCC Rcd. at 17170–71 ¶ 320, 17173–74
¶ 325.  At the same time, incumbent LECs generally need not unbundle loops in
greenfields because they have no built-in historical advantage over competitive LECs
in providing service in these areas.  *See id.* at 17143 ¶ 275.

The question is what law applies to DS1 and DS3 loops located in greenfield
areas.  AT&T contends that subsection (a)(3)(ii) frees it of any obligation to provide
access to greenfield fiber-to-home and fiber-to-curb loops, regardless of the speed of the
loops.  The commission contends that subsections (a)(4)(i) and (a)(5)(i) obligate AT&T
to provide access to all DS1 and DS3 loops, regardless of whether they are located in
greenfield areas or not.

The text of the regulation does not resolve this tension.  It is true, as AT&T
argues, that "a more specific [regulatory] provision takes precedence over a more general
one."  *First Am. Title Co. v. DeVaugh*, 480 F.3d 438, 450 (6th Cir. 2007); *see* AT&T Br.
at 29.  But neither one of these provisions counts as the more specific formulation.
Subsection (a)(3)(ii) regulates greenfield areas but makes no mention of loop speed;
subsections (a)(4)(i) and (a)(5)(i) regulate DS1 and DS3 loops but make no mention of
greenfield status.  If there were a regulation that said, "Incumbent LECs need not provide
access in greenfield areas, even for DS1 and DS3 loops," or "Incumbent LECs must
provide access to all DS1 and DS3 loops, even in greenfields," *that* kind of specific
regulation would take precedence.  But we have no such provision here.

Happily for us, the *Triennial Review Order* clarifies the picture.  The FCC
determined that "DS1 loops will be available to requesting carriers, without limitation,
regardless of the technology used to provide such loops . . . and regardless of the
customer for which the requesting carrier will serve *unless otherwise specifically*

*indicated. See supra* Part VI.A.4.a.(v) (discussing FTTH)." 18 FCC Rcd. at 17173 n.956 (emphasis added). The cross-reference adds: "Incumbent LECs do not have to offer unbundled access to newly deployed or 'greenfield' fiber loops." *Id.* at 17142 ¶ 273. That provides strong evidence that the FCC intended the DS1/DS3 regulations to yield to its conclusion that unbundling is not required in greenfield areas. The FCC's rationale for exempting greenfield loops from the unbundling requirement provides further evidence: "[T]he entry barriers [in greenfield areas] appear to be largely the same for both incumbent and competitive LECs," which applies with equal force to DS1 and DS3 loops. *Id.* at 17143 ¶ 275. Incumbent LECs need not offer unbundled access to DS1 and DS3 loops in greenfield areas.

D.

Must incumbent LECs, upon request, "commingle"—package together—unbundled network elements provided under § 251 with elements mandated only by § 271? Yes.

Another FCC regulation, 47 C.F.R. § 51.309, provides the operative rule:

(e) Except as provided in § 51.318, an incumbent LEC shall permit a requesting telecommunications carrier to commingle an unbundled network element or a combination of unbundled network elements with wholesale services obtained from an incumbent LEC.

(f) Upon request, an incumbent LEC shall perform the functions necessary to commingle an unbundled network element or a combination of unbundled network elements with one or more facilities or services that a requesting telecommunications carrier has obtained at wholesale from an incumbent LEC.

Under these provisions, incumbent LECs must "permit," and "perform the functions necessary" to facilitate, the commingling of unbundled network elements (i.e., those provided under § 251) with elements that a competitive LEC obtains at wholesale. The question is whether § 271 elements qualify as "facilities or services . . . obtained at wholesale from an incumbent LEC." Section 51.309 does not of its own force require

incumbent LECs to make any elements available, but it does require the commingling of § 251 elements with elements obtained at wholesale under AT&T's § 271 obligations.

The term "wholesale" is a critical one. It refers to "[t]he sale of goods or commodities usu[ally] to a retailer for resale, and not to the ultimate consumer." Black's Law Dictionary (9th ed. 2009). That definition covers § 271 elements, a conclusion the FCC has repeatedly reached. It has described § 271 elements and requirements as "wholesale obligations," *Omaha Order*, 20 FCC Rcd. 19415, 19448–49 ¶ 67, 19467–68 ¶ 105 (2005), "wholesale inputs," *id.* at 19449–50 ¶ 68, "wholesale offerings," *id.* at 19448 ¶ 67; *Phoenix Order*, 25 FCC Rcd. 8622, 8662 ¶ 75 (2010), and "wholesale access rights," *Phoenix Order*, 25 FCC Rcd. at 8639 ¶ 33, 8662 ¶ 75; *see also Omaha Order*, 20 FCC Rcd. at 19462–63 ¶ 96, 19465 ¶ 100, 19466 ¶ 103; *Anchorage Order*, 22 FCC Rcd. 1958, 1962–63 ¶ 8 (2007). The essential point of § 271—to ensure that incumbent LECs, in exchange for the right to provide long-distance service, make certain facilities and services available to competitive LECs to be repackaged and resold to consumers—is to allow competitive LECs to obtain those elements at a wholesale rate. The only court of appeals to consider the question concluded that § 271 elements are obtained at wholesale and must be commingled with § 251 elements under the FCC regulations. *Nuvox Commc'ns, Inc. v. BellSouth Commc'ns, Inc.*, 530 F.3d 1330 (11th Cir. 2008).

We agree: the regulation obligates AT&T to commingle § 251 elements with § 271 elements upon request. But even if it were ambiguous, the commission would prevail on this point. At our request, the FCC filed an amicus brief in which it adopts the commission's view. If the text were ambiguous, we would defer to the FCC's reasonable interpretation of its own regulation that the agency advances in its amicus brief. *See Chase Bank USA, N.A. v. McCoy*, 562 U.S. ___, 131 S. Ct. 871, 880–81 (2011); *Auer v. Robbins*, 519 U.S. 452, 461–62 (1997).

AT&T counters in two ways. Regardless of what the federal regulations require, it says that the commission lacks the authority to enforce them because the FCC has

exclusive enforcement power under § 271. *See* Br. at 49–50. AT&T's premise—that state commissions cannot enforce § 271—is correct. *See supra* Part II.A. But its conclusion—that they also cannot enforce the FCC regulations at issue—does not follow. The commission seeks to hold AT&T to its obligations under 47 C.F.R. § 51.309, a rule the FCC issued in order to "implement . . . 47 U.S.C. [§§] 251 and 252," not § 271. 47 C.F.R. § 51.1(b). Once the FCC determines that AT&T must provide a certain element at wholesale under § 271, § 51.309 gives the commission authority to require AT&T to commingle that element with any element it must provide in unbundled form under § 251. The commission's power to implement § 51.309 stems from its general authority to ensure that incumbent LECs meet their § 251 obligations. *See* 47 U.S.C. § 252(e); *Verizon New England*, 509 F.3d at 7. That authority does not evaporate merely because the wholesale element in question happens to be one provided under § 271.

AT&T adds that § 271 elements are not "facilities or services . . . obtained at wholesale from an incumbent LEC" because the FCC intended the language of its regulation to reach only facilities or services obtained under an interstate access tariff. *See* Br. at 50–59. AT&T offers five justifications for this proposed interpretation of § 51.309, but they do not justify departing from a straightforward reading of the regulation, much less departing from the reading the FCC embraces.

*First*, AT&T cites a footnote in the *TRO* in which the FCC "decline[d] to require [Bell companies], pursuant to section 271, to combine network elements that no longer are required to be unbundled under section 251." 18 FCC Rcd. at 17386 n.1990; *see* Br. at 50–51; Reply Br. at 11–12. But, as the Eleventh Circuit recognized, "[t]his footnote addresses combinations of section-271 elements with other section-271 elements, not the commingling of section-251 elements with section-271 elements." *Nuvox*, 530 F.3d at 1334. The footnote does not say that incumbent LECs need not combine § 271 elements with any other elements.

*Second*, AT&T notes that throughout the *TRO*, the FCC indicated that the commingling rule applied to tariffed services. *See* Br. at 46 & n.38, 56; Reply Br. at 20. But nothing in that order or anywhere else indicates that the FCC intended the commingling rule to apply *only* to tariffed services. The FCC says only that wholesale services "includ[e]" tariffed services, *TRO*, 18 FCC Rcd. at 17343 ¶ 581; *see also id.* at 16990 ¶ 7; *id.* at 17342 ¶ 579, signaling that the examples are "illustrative rather than exhaustive." *Samantar v. Yousuf*, 560 U.S. ___, 130 S. Ct. 2278, 2287 (2010); *see also Nuvox*, 530 F.3d at 1334. Elsewhere in the *TRO*, the FCC suggested that "wholesale services" include services obtained under "interconnection agreements [and] other contracts," not just tariffs. 18 FCC Rcd. at 17345 n. 1794.

*Third*, AT&T places great weight on the FCC's decision to delete a phrase from the *TRO* that would have made it explicit that the commingling requirement applies to § 271 elements. *See* Br. at 52; Reply Br. at 13; *TRO Errata*, 18 FCC Rcd. 19020, 19022 ¶ 27 (2003). But the point cuts both ways: The FCC also deleted a sentence at the end of footnote 1990 of the *TRO* that would have explicitly *exempted* § 271 items from the commingling requirement. *See TRO Errata*, 18 FCC Rcd. at 19022 ¶ 31. Given the variety of reasons the FCC might have had for deleting these two passages, *see Nuvox*, 530 F.3d at 1334, it is perilous to read too much into its decision to do so. *Cf. U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 815 n.27 (1995); *Regan v. Wald*, 468 U.S. 222, 237 n.20 (1984).

*Fourth*, AT&T cites a line from the *Omaha Order* that, it argues, referred to an incumbent LEC's obligation to commingle § 271 elements with § 251 elements "even in the absence of a legal mandate to do so." *Omaha Order*, 20 FCC Rcd. at 19455 ¶ 82; *see* Br. at 51–52; Reply Br. at 22–23. But this line refers to the absence of a legal mandate to "replace" the platform of § 251 unbundled network elements the FCC required prior to the *TRO*. It says nothing about whether a legal mandate exists to commingle § 271 elements with § 251 elements.

*Fifth*, AT&T argues that a required commingling of § 271 elements with § 251 elements "undermines federal policy" because incumbent LECs must then provide the same combination of elements that the FCC has declined to mandate under § 251. Br. at 53. Not true. For one thing, incumbent LECs may charge market rates for § 271 elements, leaving them better off than they were under the prior FCC regime. *See Nuvox*, 530 F.3d at 1335. More to the point, given the overlap between the two sections, it should come as no surprise that § 271 imposes on Bell companies some obligations that § 251 no longer imposes on non-Bell-company incumbents. The FCC's decision to remove certain elements from the scope of § 251 does not mean that the FCC intended to free Bell companies of their obligations to provide some of those elements under § 271.

III.

For these reasons, we affirm.