# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2590

_____

| | | |
|---|---|---|
| Qwest Corporation, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Minnesota Public Utilities Commission; | * | |
| David Boyd, in his official capacity as | * | |
| Chairman of the Minnesota Public | * | |
| Utilities Commission; J. Dennis | * | Appeal from the United States |
| O'Brien; Thomas Pugh; Phyllis Reha; | * | District Court for the |
| Betsy Wergin, in their official | * | District of Minnesota. |
| capacities as members of the Minnesota | * | |
| Public Utilities Commission, | * | |
| | * | |
| Appellees. | * | |
| _____ | * | |
| | * | |
| AT&T, Inc.; Verizon, | * | |
| | * | |
| Amici on behalf | * | |
| of Appellant. | * | |

_____

Submitted: February 15, 2012
Filed: July 12, 2012

_____

Before RILEY, Chief Judge, WOLLMAN and SMITH, Circuit Judges.

_____

RILEY, Chief Judge.

The Minnesota Public Utilities Commission (commission) entered an order requiring Qwest Corporation, a successor Bell operating company (BOC),[1] to submit for review and approval a price list and supporting rationale for certain telecommunication network facilities 47 U.S.C. § 271 requires Qwest to provide to its Minnesota competitors. Qwest sought judicial review and declaratory relief in the district court, arguing the commission's order was preempted by the Telecommunications Act of 1996 (Act), Pub. L. No. 104–104, 110 Stat. 56 (codified as amended in scattered sections of Title 47 of the United States Code). The district court concluded federal law and regulations did not preempt the commission's order. We disagree and reverse.

## I.  BACKGROUND

Qwest provides intrastate telecommunication services in Minnesota. Historically, such local phone service was dominated by local service providers known as incumbent local exchange carriers (ILECs) with an exclusive franchise. See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999); see also 47 U.S.C. § 251(h) (defining incumbent local exchange carrier). Under the Communications Act of 1934, 47 U.S.C. § 151 et seq., intrastate services were generally regulated by state commissions while interstate services were regulated by the Federal Communications Commission (FCC). See 47 U.S.C. § 152(b).

That structure changed dramatically in 1996. The Act "fundamentally restructure[d] local telephone markets," taking "the regulation of local

---

[1]BOCs are local phone companies (and their successors) formed by the antitrust consent decree that both divested AT&T of its local operating companies beginning in 1982 and prohibited BOCs from providing long-distance service. See 47 U.S.C. § 153(5); United States v. Am. Tel. & Tel. Co., 552 F. Supp. 131, 141, 224-25 (D.D.C. 1982) aff'd sub nom. Maryland v. United States, 460 U.S. 1001 (1983).

telecommunications competition away from the States" and imposing on ILECs "a host of duties intended to facilitate market entry" by competitors, and end "the longstanding regime of state-sanctioned monopolies." AT&T Corp., 525 U.S. at 371, 378 n.6. To facilitate competition in local markets, Congress imposed two distinct sets of statutory requirements designed to remove barriers to market entry. See 47 U.S.C. §§ 251 and 271; Sw. Bell Tel., L.P. v. Mo. Pub. Serv. Comm'n, 530 F.3d 676, 680 (8th Cir. 2008).

Section 251(c)(3) of the Act requires ILECs like Qwest to share their network by leasing certain property—unbundled network elements (UNEs)[2]—to their competitors, known as competitive local exchange carriers (CLECs), on "just, reasonable, and nondiscriminatory" terms. 47 U.S.C. § 251(c)(3); see also Sw. Bell, 530 F.3d at 680. "This makes it easier for a competitor to create its own network without having to build every element from scratch." Talk Am., Inc. v. Mich. Bell Tel. Co., 564 U.S. ___, ___, 131 S. Ct. 2254, 2258 (2011). The FCC determines which network elements ILECs must make available for lease by considering whether access to the elements is "necessary" and whether failing to provide access "would impair the ability of the [CLEC] to provide the services that it seeks to offer." 47 U.S.C. § 251(d)(2).

If the carriers are unable to agree on a rate for those § 251 network elements, they can petition the state commission to arbitrate unresolved issues under 47 U.S.C. § 252(b). The state commissions use the "total element long-run incremental cost" (TELRIC) methodology adopted by the FCC to set cost-based regulated rates under § 251. See 47 C.F.R. § 51.505; see also Verizon Commc'ns, Inc. v. FCC, 535 U.S. 467, 495-97, 522-23, 539 (2002) (explaining the TELRIC methodology and validating its use for setting rates under the Act).

---

[2]"The term 'network element' means a facility or equipment used in the provision of a telecommunications service." 47 U.S.C. § 153(35).

Section 271 of the Act provides a means for BOCs like Qwest, who could not provide long distance to their local customers under the consent decree, to petition the FCC for permission to provide long-distance services under certain access and interconnection requirements contained in a "competitive checklist" in § 271(c)(2)(B). See 47 U.S.C. § 271. If Qwest wants to provide long-distance services, it must comply with § 251 and make certain unbundled network facilities that are not covered by § 251 available to competitors. See id.

In contrast to the dual federal and state regime created in § 251, "the plain language of § 271 makes clear states have no authority to interpret or enforce the obligations of § 271." Sw. Bell, 530 F.3d at 681-82. Unlike § 251, which creates a role for the states in regulating rates, § 271 gives states only a limited "advisory role at the application stage of the § 271 process." Id. at 682-83. "[T]he authority to impose substantive requirements [is] exclusively the prerogative of the FCC." Id. at 683.

In 1999, the FCC determined "it would be counterproductive" to require a BOC to provide § 271 elements at "forward-looking prices. Rather, the market price should prevail as opposed to a regulated rate." In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, 15 FCC Rcd. 3696, 3906 ¶ 473 (1999) (UNE Remand Order). In 2003, the FCC stated that, unlike § 251 UNEs, network elements unbundled under § 271 were not subject to TELRIC rates, but instead were subject to the "just, reasonable and not unreasonably discriminatory basis" standard set forth in 47 U.S.C. §§ 201 and 202. See In the Matter of Unbundled Access to Network Elements Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 18 FCC Rcd. 16978, 17386-89 ¶¶ 656-64 (2003) (Triennial Review Order or TRO), vacated in part and remanded, U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 594 (D.C. Cir. 2004). "In practical terms, that means BOCs like Qwest can charge higher rates for elements unbundled under Section 271 than they could if the cost-based approach to rates for elements

unbundled under Section 251 applied." Qwest Corp. v. Ariz. Corp. Comm'n, 567 F.3d 1109, 1115 (9th Cir. 2009).

In Minnesota, Qwest provides to CLECs certain network elements referred to as high-capacity transport (circuits that carry signals from one router to another) and high-capacity loops (a wire from the customer to the phone company's router) at rates determined through tariffs on file with (1) the commission for intrastate service and (2) the FCC for interstate service.

In 2005, after several unsuccessful attempts to develop unbundling rules the courts would accept, the FCC issued the Triennial Review Remand Order (TRRO) in which the FCC identified the UNEs that ILECs like Qwest are required to lease to CLECs under § 251(c)(3). See In re Unbundled Access to Network Elements Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 20 FCC Rcd. 2533 (2005), aff'd, Covad Commc'ns Co. v. FCC, 450 F.3d 528 (D.C. Cir. 2006). In the TRRO, the FCC stated high-capacity transport and high-capacity loops were no longer subject to unbundling requirements in competitive markets. Id. at 2575-641.

One effect of the TRRO was that Qwest no longer had to provide those network elements under § 251(c)(3) in twenty-two major Minnesota markets. Qwest continues to provide them as required by § 271, but at rates as much as three times higher than those it charges interstate customers for the same facilities.

On January 9, 2006, the commission issued a show-cause order directing Qwest to show why the commission should not open contested-case proceedings to investigate whether Qwest's wholesale intrastate rates for § 271 network elements were "just and reasonable." Qwest responded the commission had no authority over the intrastate rates charged for § 271 elements because the Act gave the FCC exclusive jurisdiction over such rates and preempted the commission's authority.

Finding concurrent state and federal jurisdiction, the commission referred the question to the Office of Administrative Hearings for contested-case proceedings before two administrative law judges (ALJs). Following a two-day hearing beginning April 9, 2008, the ALJs found (1) the commission had authority to regulate intrastate rates for § 271 elements under Minnesota law, and (2) Qwest's rates were unjust and unreasonable. The ALJs recommended the commission "(1) require Qwest to file a wholesale tariff or price list for network elements that it is obligated to provide to local service competitors or that it voluntarily provides; [and] (2) cap the prices for those elements at Qwest's interstate access rates."

On April 23, 2010, the commission issued an order directing Qwest to "[s]ubmit for [c]ommission review and approval a list of prices for wholesale elements that Qwest is obligated to provide to local service competitors or that it provides voluntarily, other than elements subject to 47 U.S.C. § 251." The order also required Qwest to provide a "detailed rationale" explaining any proposed difference between any intrastate rate and its corresponding interstate rate and demonstrating the result was "just, reasonable and nondiscriminatory." On May 12, 2010, Qwest filed a petition for rehearing, which the commission denied.

On August 24, 2010, Qwest challenged the commission's final order in the district court. On January 21, 2011, Qwest moved for judicial review and declaratory relief, "seeking declarations that the [commission's] rulings violate federal law, are arbitrary and capricious, and are preempted by federal law; and that the [commission] exceeded its authority under the Act."

On June 27, 2011, the district court denied Qwest's motion and dismissed the complaint with prejudice. The district court rejected Qwest's preemption argument, reasoning § 601(c)(1) of the Act preserved the states' authority to regulate facilities required by § 271 as long as there was no conflict with federal law. Finding no conflict, the district court concluded the commission "acted within its state law

authority in issuing the [order] . . . and that the [order was] not preempted by federal law or federal regulations." Qwest appeals.

## II. DISCUSSION

### A. Standard of Review

We review de novo the district court's order denying Qwest's motion and dismissing Qwest's complaint with prejudice, applying the same standards as the district court. See Ace Tel. Ass'n v. Koppendrayer, 432 F.3d 876, 878 (8th Cir. 2005). "We review the [commission's] interpretation and application of federal law de novo and will set aside its findings of fact only if they are arbitrary and capricious." Sw. Bell, 530 F.3d at 682. In interpreting the Act and FCC regulations promulgated thereunder, "we owe deference to the [FCC] based on the fact that Congress expressly charged the FCC with the duty to promulgate regulations to interpret and carry out the Act." WWC License, L.L.C. v. Boyle, 459 F.3d 880, 890 (8th Cir. 2006) (citing AT&T Corp., 525 U.S. at 378).

### B. Preemption

Relying on our decision in Southwestern Bell and similar cases from other courts, Qwest contends the commission's finding "that it has jurisdiction over the prices of wholesale elements and services required by § 271" conflicts with the language of the Act and "has been overwhelmingly rejected by the courts." In Southwestern Bell, we determined a state commission exceeded its authority by ordering an ILEC to allow CLECs broader access to its facilities network than the Act required. See Sw. Bell, 530 F.3d at 680. After noting "the plain language of § 271 makes clear states have no authority to interpret or enforce the obligations of § 271," we "join[ed] those federal courts which ha[d] concluded the FCC has exclusive jurisdiction over § 271." Id. at 682-83. Qwest cogently argues, "Because state commissions are without authority to impose any requirements with respect to the obligations of § 271, it follows that they cannot set rates for the network elements and services BOCs provide under that section."

The district court agreed with Qwest that the commission did "not have authority under federal law to set rates for Section 271 Elements," but concluded the commission "was asserting authority under state law in the [order]." See Minn. Stat. § 237.06 (requiring telephone companies to charge fair and reasonable rates for intrastate services and facilities). Qwest maintains any assertion of authority by the commission to regulate rates for § 271 elements under state law is preempted by the Act and the FCC's rulings and regulations.

"[T]he Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 712-13 (1985) (quoting Gibbons v. Ogden, 22 U.S. 1, 82, 9 Wheat. 1, 211 (1824) (Marshall, C.J.)).

> Our inquiry into the scope of a statute's pre-emptive effect is guided by the rule that "'[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (quoting Retail Clerks v. Schermerhorn, 375 U.S. 96, 103 (1963)). Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose. See Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977).

Altria Grp., Inc. v. Good, 555 U.S. 70, 76 (2008) (internal parallel citations omitted).

In the absence of express pre-emptive language, "[p]re-emptive intent may . . . be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." Id. at 76-77. "Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963), or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' Hines v. Davidowitz, 312 U.S. 52, 67 (1941)." Hillsborough, 471 U.S. at 713

(internal parallel citations omitted). "Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 369 (1986).

> When addressing questions of express or implied pre-emption, we begin our analysis "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States. Lohr, 518 U.S. at 485.

Altria Grp. Inc., 555 U.S. at 77 (internal parallel citations omitted).

The district court concluded Congress's silence as to a particular method for setting rates under § 271—in contrast to the specific rate-setting provisions of § 251—left the field open for the states to regulate rates for the network elements § 271 requires BOCs to provide "unless [the state's regulations] conflict[] with federal law or federal regulations." The district court reasoned § 601(c)(1)[3] of the Act preserved state-law authority to regulate rates for the § 271 elements at issue. Finding the commission "applied the same just, reasonable, and non-discriminatory standard set forth by Congress and structured the [order] consistent with FCC guidelines," the district court concluded the commission's order did "not conflict with federal law or federal regulations" and was "not preempted."

We disagree. "The Act's language, history, and purpose, in addition to the overwhelming majority of judicial and administrative decisions on the matter,

---

[3]Section 601(c)(1) provides, "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments."

persuade us that state commissions may not impose Section 271 . . . pricing requirements" under the auspices of state law. Qwest Corp., 567 F.3d at 1112; see also Verizon New Eng., Inc. v. Me. Pub. Utils. Comm'n, 509 F.3d 1, 7 (1st Cir. 2007) (holding the states' assertion of authority to set rate policy under § 271 "is at odds with the statutory language, history and policy of section 271 and most relevant precedent").

Before the Act became law in 1996, states enjoyed nearly exclusive jurisdiction over intrastate telecommunication services under "a system of dual state and federal regulation over telephone service." La. Pub. Serv. Comm'n, 476 U.S. at 360; see also 47 U.S.C. § 152. Relying heavily on the presumption against preemption, the commission asserts authority for its order based upon Minnesota statutes regulating intrastate telecommunication services beginning in 1915.

The commission's appeal to history is unavailing. The Act "unquestionably" took "the regulation of local telecommunications competition away from the States" and transferred primary authority for regulating local competition to the FCC. AT&T Corp., 525 U.S. at 378 n.6. "Under the local-competition provisions of the Act, Congress called for ratemaking different from any historical practice, to achieve the entirely new objective of uprooting the monopolies that traditional rate-based methods had perpetuated." Verizon Commc'ns, Inc., 535 U.S. at 488 (citing H.R. Conf. Rep. No. 104–230, at 113 (1996)).

Given Congress's clear purpose and objectives in creating "a complex federal scheme to encourage competition in local telephone service markets," Qwest Corp., 567 F.3d at 1111, the commission fails to persuade us congressional silence as to a specific method of setting rates within § 271 demonstrates Congress intended to "preserve" state-law authority to set rates for network elements first required as part of § 271 of the Act. See AT&T Corp., 525 U.S. at 378 n.6 (explaining the presumption against preemption did not apply to the analysis of state-law authority

under 47 U.S.C. § 252); MCI Telecomm. Corp. v. Bell Atl.–Pa., 271 F.3d 491, 510 (3d Cir. 2001) ("The Act . . . validly preempted state regulation over competition to provide local telecommunications service."); AT&T Commc'ns v. BellSouth Telecomms. Inc., 238 F.3d 636, 646 (5th Cir. 2001) ("After passage of the 1996 Act, regulation of competition among providers of local phone service is no longer within the province of states' inherent authority. Congress, by enacting the 1996 Act pursuant to its commerce power, validly preempted the states' power to regulate local telecommunications competition.").

"We decline to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law." United States v. Locke, 529 U.S. 89, 106-07 (2000). "The new regime for regulating competition in this industry is federal in nature, and while Congress has chosen to retain a significant role for the state commissions, the scope of that role is measured by federal, not state law." Sw. Bell Tel. Co. v. Connect Commc'ns Corp., 225 F.3d 942, 947 (8th Cir. 2000)) (internal citation omitted).

Under 47 U.S.C. § 201(b) of the Act, "[t]he FCC has rulemaking authority to carry out the 'provisions of [the] Act,'" including § 271. See AT&T Corp., 525 U.S. at 378. In exercising that authority, the FCC rejected the argument that a state commission "shared" jurisdiction with the FCC over intrastate boundaries "purely" constructed under federal law because the applicable statute did not prohibit the state commission from modifying the boundaries. See In re Application for Review and Petition for Reconsideration or Clarification of Declaratory Ruling Regarding US West Petitions to Consolidate LATAs in Minnesota and Arizona, 14 FCC Rcd. 14392, 14401 ¶ 18 (1999) (InterLATA Boundary Order).

Finding such "shared" authority "inconsistent with . . . the exclusive authority that Congress intended that the [FCC] exercise over the [§] 271 process," the FCC stated, "as the Supreme Court recently held in AT&T Corp. v. Iowa Utilities Bd., the

1996 Act's silence regarding state jurisdiction, rather than implicitly allocating jurisdiction to the states, assures that [FCC] jurisdiction is not superseded, and the FCC jurisdiction 'always follows where the Act applies.'" Id. at 14401-02 ¶ 18 (footnotes omitted) (quoting AT&T Corp., 525 U.S. at 380).

In the Triennial Review Order, the FCC explained that § 271 elements, unlike § 251 UNEs, were not subject to TELRIC rates, but instead were subject to the "just, reasonable and not unreasonably discriminatory basis" standard set forth in 47 U.S.C. §§ 201 and 202. See TRO, 18 FCC Rcd. at 17386-89 ¶¶ 656-64. The FCC further stated, "[w]hether a particular checklist element's rate satisfies the just and reasonable pricing standard of sections 201 and 202 is a fact-specific inquiry that the [FCC] will undertake in the context of a BOC's application for section 271 authority or in an enforcement proceeding brought pursuant to section 271(d)(6)." Id. at 17389 ¶ 664. The FCC noted

> a BOC might satisfy this standard by demonstrating that the rate for a section 271 network element is at or below the rate at which the BOC offers comparable functions to similarly situated purchasing carriers under its interstate access tariff, to the extent such analogues exist. Alternatively, a BOC might demonstrate that the rate at which it offers a section 271 network element is reasonable by showing that it has entered into arms-length agreements with other, similarly situated purchasing carriers to provide the element at that rate.

Id.

The commission acknowledges the sea change resulting from the Act and the FCC's implementing rulings and regulations, but maintains nothing in the Act gives the FCC exclusive authority over the rates for facilities required by § 271. According to the commission, in the Triennial Review Order, the FCC merely describes "how and when the FCC will conduct its review of whether a rate for a [§] 271 element

-12-

meets the 'just and reasonable' standard," but "does not expressly preclude the states from using concurrent state law authority to determine whether intrastate rates for the use of [§] 271 elements are unjust or unreasonable."

Similar assertions of authority by state utility commissions to set rates for § 271 elements, including assertions purportedly based on state law, have been roundly rejected by the courts. See, e.g., BellSouth Telecomms., Inc. v. Ky. Pub. Serv. Comm'n (KPSC), 669 F.3d 704, 708-09 (6th Cir. 2012) (concluding the "FCC alone enforces § 271" and efforts by the state commission to enforce "fair, just and reasonable" rates directly conflicted with federal law); Qwest Corp., 567 F.3d at 1116, 1118 (joining "the First, Seventh, Eighth, and Eleventh Circuits in holding that the Act does not authorize state commissions to implement Section 271 terms and rates" and finding conflict preemption also restricted state power to make pricing determinations for § 271 elements); BellSouth Telecomms., Inc. v. Ga. Pub. Serv. Comm'n, 555 F.3d 1287, 1288 (11th Cir. 2009) (per curiam) (affirming that a state utility commission "lacks authority pursuant to either federal or state law to implement 47 U.S.C. § 271 . . . for the reasons stated in the [trial] court's well-reasoned order"), aff'g 587 F. Supp. 2d 1258 (N.D. Ga. 2008); Ill. Bell Tel. Co. v. Box, 548 F.3d 607, 612 (7th Cir. 2008) (finding "real conflict between the federal and state regulatory schemes"); Sw. Bell, 530 F.3d at 682 (holding "the plain language of § 271 makes clear states have no authority to interpret or enforce the obligations of § 271"); Verizon New Eng., Inc., 509 F.3d at 7, 9 (concluding "*authority* under section 271 is granted exclusively to the FCC" and "the right to set prices for the elements flows from the FCC's power to set just and reasonable rates" and deciding the assertion of state-law authority was in direct conflict with specific FCC policies).

In BellSouth, the Georgia Public Service Commission asserted jurisdiction under § 271 and state law to set just and reasonable rates for unbundled network elements BellSouth was required to provide under § 271. BellSouth, 587 F. Supp. 2d at 1261, 1263. The trial court held

-13-

given the federal statutory scheme involved here, there cannot be a patchwork of individual state judgments about whether to set regulated rates for these facilities. Rather, Congress gave the FCC exclusive authority to determine compliance with § 271, and that federal agency has made clear that *it* will review rates, if necessary, for these facilities.

Id. at 1264.

Like the Eleventh Circuit, we find this reasoning persuasive. It would be inconsistent with Congress's grant of exclusive authority over § 271 to the FCC to interpret the Act as permitting the states to set rates for § 271 elements required by federal law. See InterLATA Boundary Order, 14 FCC Rcd. at 14401-02 ¶ 18 (quoting AT&T Corp., 525 U.S. at 380). As the Supreme Court observed, "a federal program administered by 50 independent state agencies is surpassing strange." AT&T Corp., 525 U.S. at 378 n.6.

The court in BellSouth also noted that, unlike § 251, § 271 contains no "savings clause, strongly signaling Congress's expectation that state commissions would not exercise independent state-law authority with respect to § 271 checklist items." BellSouth, 587 F. Supp. 2d at 1264; see also Verizon New Eng., Inc., 509 F.3d at 7 (explaining the absence of a "clause reserving state power" in § 271 demonstrated Congress "intended federal supremacy and the absence of state power under section 271"). In concluding the FCC's authority to administer § 271 is exclusive in Southwestern Bell, we likewise noted the distinction between the framework of §§ 251 and 252, which established a role for states in setting just and reasonable rates and expressly includes a savings clause, and § 271, which does not. See Sw. Bell, 530 F.3d at 682-83; see also Qwest Corp., 567 F.3d at 1117-18.

We and the other circuits also have concluded the text and structure of § 271, which allows states only a limited consultative role and makes enforcement entirely the responsibility of the FCC, confirm the FCC's exclusive authority to determine the

rates for § 271 elements.  See Qwest Corp., 567 F.3d at 1116-18; Southwestern Bell, 530 F.3d at 682-83; Verizon New Eng., Inc., 509 F.3d at 7; BellSouth, 587 F. Supp. 2d at 1261-62.

Some of our discussion in Southwestern Bell of the FCC's exclusive authority to enforce § 271—and corresponding analysis from numerous other courts concluding state commissions lack authority to set rates for § 271 elements— does not directly apply to this case because the commission asserts authority under state law and § 601(c)(1) rather than § 271.  But the rationale in those cases underscores our conclusion that Congress's silence in § 271 regarding state authority is not strong evidence of congressional intent to leave the field open to state regulation.  See Ill. Bell Tel. Co., 548 F.3d at 611 ("The Act does not say in so many words that the state commission cannot require the unbundling of non-network elements any more than it says that about unbundling network elements, but to allow a state commission to require it would defeat the Act's goals.").

The commission's assertion of "long-standing independent state law authority" to set rates for the § 271 elements at issue purportedly preserved by § 601(c) is belied by the facts that (1) § 271 requirements did not exist at all until 1996, when the Act created them as part of the process for BOCs to petition the FCC for the ability to provide long-distance service, and (2) Qwest's obligation to provide the network elements at issue in this case under § 271 did not exist until 2005 when the FCC removed them from the unbundling requirements of § 251.  See Qwest Corp., 567 F.3d at 1118 (noting the lack of historical support for a state commission imposing § 271 pricing terms "because the FCC's previous expansive interpretation of Section 251(c)(3)'s UNE requirements coincided with Section 271(c)'s requirements" until 2005) (citing Sw. Bell, 530 F.3d at 681).

"When the 1996 Act replaced the [antitrust consent] decree [barring BOCs from providing long-distance services], Congress aimed to transfer this authority [to

-15-

regulate the ability of BOCs to offer long distance] to the FCC—not the states." Qwest Corp., 567 F.3d at 1118 (quoting Verizon New Eng., Inc., 509 F.3d at 8) (internal marks omitted)). There is simply no preexisting state authority over Qwest's obligations under § 271 for § 601(c) to preserve.

"If the commission thinks [Qwest] is not honoring its § 271 obligations, the 1996 Act gives the commission recourse: file a complaint with the FCC." KPSC, 669 F.3d at 708; see also 47 U.S.C. § 271(d)(6). The Act does not permit each state commission to overlay its own judgment as to what is just and reasonable—such a result would surpass strange. See AT&T Corp., 525 U.S. at 378 n.6. The Act and the FCC's rulings and regulations are sufficiently comprehensive to convince us that Congress, in transferring authority to regulate local competition from the states to the FCC, did not intend to allow state regulation of rates for § 271 elements. The commission's order regulating rates for elements Qwest is required to provide under § 271 is preempted by federal law.

Even if we assume the Act left some room in the field for state regulation of the rates BOCs can charge for § 271 elements under state law, the commission's order impermissibly conflicts with federal law and FCC policy. "State regulation, even when authorized by local law, must give way not only 'where Congress has legislated comprehensively' in a field with an aim to occupy it, but also 'where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.'" Verizon New Eng., Inc., 509 F.3d at 9 (quoting La. Pub. Serv. Comm'n, 476 U.S. at 368-69).

As noted above, the circuit courts that have considered the states' authority to impose regulated rates for § 271 elements universally have determined the states' assertions of such authority impermissibly conflict with the FCC's decision to allow BOCs to charge market rates for § 271 elements. See, e.g., Qwest Corp., 567 F.3d at 1118 (deciding "due to conflict preemption, state law cannot empower state

commissions to prescribe or fix rates for Section 271 terms" because "it interferes with Congress' chosen method in effectuating the purposes of the Act" (quoting Ting v. AT&T, 319 F.3d 1126, 1146 (9th Cir. 2003) (internal marks omitted))); BellSouth, 587 F. Supp. 2d at 1264 (explaining the state commission "could not rely on state law to justify its decision to set rates for the facilities and services at issue . . . in light of the federal scheme the 1996 Act created" because the state commission's "decision to set regulated rates contravenes the FCC's conclusion that rates set through other means can satisfy § 271").

The commission contends such findings of conflict preemption are "flawed" because they do not address § 601(c)(1). But "[n]othing in the language of [that] saving clause suggests an intent to save state-law [regulatory actions] that conflict with federal regulations." Geier v. Am. Honda Motor Co., 529 U.S. 861, 869 (2000).

The commission also asserts "this case is very different from all the other Section 271 cases addressing state law preemption that have come before it" because the prior cases all involved "cost-based rates that conflict with the Act and FCC orders."[4] The commission states it "followed the FCC's guidance and authorized Qwest to set its intrastate rates at the comparable interstate rates," which "are presumed to be just and reasonable under federal law." According to the commission, "there is no conflict preemption because the [commission's] order furthers the purposes of the act and the FCC's 'just and reasonable' pricing standard." We disagree.

---

[4]The commission filed its brief before the Sixth Circuit held state efforts to enforce "fair, just and reasonable" rates directly conflicted with federal law. See KPSC, 669 F.3d at 704. On February 2, 2012, Qwest submitted the case as supplemental authority pursuant to Fed. R. App. P. 28(j), and the commission duly responded before oral argument.

"In deciding whether the [commission's] order stands as an obstacle to the full implementation of the Act, it is not enough to say that the ultimate goal of both federal and state law is the same." Qwest Corp., 567 F.3d at 1118 (quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987) (internal marks omitted)). While the commission draws a valid distinction between cost-based TELRIC rates and the rate-setting methodology the commission adopted, which it describes as a "soft cap," the commission's approach still conflicts with federal law. See KPSC, 669 F.3d at 708-09. "The FCC's regulation . . . bars the imposition of *any* rate other than the open-market rate, meaning that any price regulation by a state commission creates a conflict." Id. at 709 (determining the state commission's imposition of "'fair, just, and non-discriminatory rates,' which it describes as being 'market based'" rather than TELRIC rates for "newly de-listed elements" did not prevent a conflict).

Though Qwest ostensibly could comply with "both federal and state law, . . . there is a real conflict between the federal and state regulatory schemes" because "the market rate [the FCC permits] *has* to be higher" than the just, reasonable and nondiscriminatory rates the commission would permit. Ill. Bell Tel. Co., 548 F.3d at 611-12. "Otherwise, why claim a right to impose the state-law rate?" KPSC, 669 F.3d at 709.

At oral argument, the commission admitted a disagreement between the commission and the FCC as to what is fair and reasonable would create a conflict. Yet in the absence of an actual disagreement or an expected one, there is no salient reason for (1) the state independently to set and review rates, and (2) Qwest's competitors to challenge Qwest's rates for § 271 elements before the state commission, as they did here, rather than seeking FCC review under the procedure Congress provided in § 271(d)(6). See Ill. Bell Tel. Co., 548 F.3d at 611-12.

The commission's assertion of state-law authority to regulate Qwest's rates for network elements Qwest provides to comply with § 271 conflicts with the FCC's

-18-

exclusive authority to enforce § 271. By definition, exclusive regulatory authority cannot be shared by two independent regulatory agencies. Any attempt by the commission to regulate rates based on the commission's independent determination of reasonableness interferes with the FCC's exclusive authority to determine if a fact-specific review of Qwest's rates is necessary and if the contested rates are fair and reasonable under the FCC's market-based approach.

Because the commission's order impermissibly intrudes on federal authority to regulate rates for elements required under § 271 and interferes with the purpose and objectives of Congress and the FCC, we conclude the order is preempted by the Act and the FCC's implementing regulations and rulings.

## III. CONCLUSION

We reverse the judgment of the district court, and remand to the district court to enter relief and judgment consistent with this opinion.

_____